NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-4523

THE STATE OF OHIO, APPELLEE, *v*. FROMAN, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Froman*, Slip Opinion No. 2020-Ohio-4523.]

*Criminal law—Aggravated murder—Findings of guilt and death sentence affirmed.*

(No. 2017-0938—Submitted June 12, 2019—Decided September 24, 2020.)

APPEAL from the Court of Common Pleas of Warren County,

No. 2014-CR-30398.

_____

O'CONNOR, C.J.

{¶ 1} Appellant, Terry Lee Froman, appeals as of right his aggravated-murder conviction and accompanying death sentence. A Warren County jury found Froman guilty of the aggravated murder of Kimberly Thomas and of two death-penalty specifications: committing aggravated murder as part of a course of conduct involving the purposeful killing of two or more persons (Thomas and her son, Michael Eli Mahoney ("Eli")), R.C. 2929.04(A)(5); and committing aggravated murder during the commission of a kidnapping, R.C. 2929.04(A)(7). The jury

recommended a sentence of death. The Warren County Court of Common Pleas accepted that recommendation and sentenced Froman accordingly.

{¶ 2} We affirm Froman's judgment of conviction and death sentence.

## I. TRIAL EVIDENCE

### A. Thomas's relationship with Froman

{¶ 3} Evidence introduced at trial indicated that Froman and Thomas had dated for approximately four years. Froman lived with Thomas and her 17-year-old son, Eli, in Mayfield, Kentucky. Thomas, a nurse, paid the rent and other bills.

{¶ 4} On the evening of August 20, 2014, Thomas ended her relationship with Froman and asked him to move out. Until Froman had moved out, Thomas and Eli stayed with Thomas's father.

{¶ 5} On the morning of August 21, Froman went to Thomas's workplace at Mills Health and Rehab Center, a nursing home. Thomas's coworker, Mary Elizabeth Munsell, became alarmed when she saw Froman in Thomas's office, because she knew that Thomas and Froman had a troubled relationship that Thomas had ended. Thomas's supervisor knocked on Thomas's office door and informed Thomas that she was needed at a meeting. Before leaving, Froman told Thomas's supervisor, "Kim has made me lose everything, now I will make her lose everything no matter the cost." Froman then left the facility.

{¶ 6} Froman moved out of Thomas's house over the Labor Day weekend. After Froman had moved out, he twice texted Thomas's next-door neighbor, Kurt Stafford, and asked Stafford if any men had been at Thomas's house. Stafford responded "no" to the first text message, and regarding the second text message, he said that he did not want to be involved.

### B. Gunshots heard near Thomas's home

{¶ 7} Around 5:00 a.m. on September 12, Stafford woke up after he heard gunshots. He then heard another gunshot. His wife did not hear the gunshots and

told him to go back to sleep. Around 6:00 a.m., Stafford went outside but he did not notice anything out of the ordinary.

### C. Abduction at the gas station

{¶ 8} Just after 7:00 a.m. on September 12, a 9-1-1 caller reported that a woman had been abducted at a gas station in Paducah, Kentucky. Surveillance video from the gas station showed Froman inside the gas station's store and his vehicle, a white GMC Yukon with an Illinois license plate with the number "TRICKE1," parked at a fuel pump. The vehicle was registered to Froman. The video showed a naked woman, later identified as Thomas, exit the vehicle and start running away. Froman rushed out of the store, grabbed Thomas by the hair, and pushed her into the back seat of the vehicle. Froman then drove away.

### D. Eli's body found at Thomas's house

{¶ 9} Police started looking for Froman following the abduction at the gas station. They contacted Mills Health and Rehab Center on September 12 and learned that Thomas had not been scheduled to work that day. One of Thomas's coworkers texted Thomas and asked her to "call me now, I need you now." A little before 10:00 a.m., Munsell received a text from Thomas's number stating, "I'll call you in a minute."

{¶ 10} Munsell and two of her colleagues then drove to Thomas's house. They saw Thomas's and Eli's cars in the driveway. They knocked on the doors and a window and noticed what they thought was a smudge of blood on the front door's glass. Munsell then opened the unlocked front door, stepped inside, and saw Eli's body on the floor. Munsell could tell that he was dead and then called 9-1-1.

{¶ 11} Police arrived at Thomas's house and found Eli lying on his back on the living room floor. Glass fragments from a shattered table lay on the floor, and there was blood spatter on the floor and walls. Eli had sustained bullet wounds to the back of his head, his abdomen, and his right forearm. Police recovered a .40-

caliber Smith & Wesson shell casing and an unfired .40-caliber Smith & Wesson round next to his body.

**E. Froman flees to Ohio**

{¶ 12} After obtaining Froman's phone number, police contacted Froman's cell-phone provider and asked the provider to "ping" Froman's cell phone to determine Froman's location. Police used the "ping" information that it received in response to track Froman's location as he headed to Ohio.

**F. Froman's phone conversations with David Clark**

{¶ 13} David Clark was a good friend of Froman and he knew Thomas and Eli. Around 4:45 a.m. on September 12, Clark received five or six phone calls from Froman, but he did not answer them. Clark testified that when he called Froman back, Froman said that he "wanted to thank me for being a good friend. And then he told me he * * * killed someone." According to Clark, Froman did not immediately say who he had killed. But Froman said that he had "done it with [Froman's] gun, so it was going to come back to him." Froman later told Clark that he had killed Eli. Froman said that he was "a couple of hours away," but he would not disclose his location.

{¶ 14} Clark drove to another friend's home and encountered Froman's daughter, Alexis Froman ("Alexis"). Alexis was attempting to call her father. Clark called Froman on his phone, and Alexis talked with Froman. She was crying and asked Froman to "let Kim go."

{¶ 15} After hearing that conversation, Clark, who was a police informant, called his point of contact, Officer Jason Montgomery, at the Paducah Police Department. Montgomery and Clark met in person about ten minutes later and then went to the Paducah police station together.

{¶ 16} Montgomery took Clark to an interview room. Clark had several phone conversations with Froman on speakerphone, which were videotaped.

4

During the calls, Froman explained what had happened earlier that morning when he shot Eli:

> [Clark]:  Did * * * he get in the way or something?
>
> [Froman]:  Yeah.  I * * * got her out of the room, and tried to * * * get her to walk out the door and she started screaming his name.  And he ran up on me.  That was it.
>
> * * *
>
> [Clark]:  What made you go to the house this morning?
>
> [Froman]:  I don't know man.  I don't even know.

{¶ 17} Froman told Clark that Thomas was totally undressed and sleeping "off and on" on the back-seat area of the vehicle.  Clark implored Froman to surrender himself to the police and to free Thomas without harming her:

> [Clark]:  Have you thought about letting her go?
>
> [Froman]:  Have I thought about it?  No, not at all.
>
> * * *
>
> It's too late.  I mean it ain't too late, but, I just can't, I can't, I can't, I can't.  I just got to.  No ifs, ands, or buts about it.
>
> * * *
>
> I mean, I know you're trying to talk me down, baby I appreciate it and all.  But like I said, I mean it's just not going to happen.  It's just not going to happen.
>
> [Clark]:  There's still good stuff to live for, Fam.
>
> [Froman]:  Man, I already took one life, and I'm about to go ahead and take two [more].

**G. Froman kills Thomas**

{¶ 18} During a later phone call, Froman told Clark that the police were following him. Froman repeated that he intended to kill Thomas:

[Froman]: I'm gonna kill her dude.

[Clark]: Don't do it Fam. Don't do it. * * * [J]ust pull over. * * *

[Clark]: Well just, man, just pull over. Don't do nothing.

[Froman]: I can't do it man.

{¶ 19} The call was then disconnected. A short time later, Clark called Froman again. Froman answered the phone and said, "She dead. I shot myself." He added, "I shot myself, and I shot her three times."

**H. The highway patrol arrests Froman and finds Thomas's body in the back seat of his vehicle**

{¶ 20} Around 1:00 p.m. on September 12, the Ohio State Highway Patrol ("OSHP") received a message to be on the lookout for a Kentucky murder suspect driving northbound on I-75 in a white GMC Yukon with an Illinois license plate with the number "TRICKE1." Troopers Nathan Stanfield and Christopher Creech spotted Froman's vehicle and pulled it over. Creech and Stanfield exited their cruisers and then heard two gunshots.

{¶ 21} A short time later, two tactical teams approached Froman's vehicle and apprehended Froman, who was sitting in the driver's seat with a gun in his hand. Froman had a bullet wound in his left upper chest near his shoulder. He was transported to a hospital for treatment.

{¶ 22} The troopers found Thomas's dead body in the back seat of Froman's vehicle. Thomas had suffered four bullet wounds.

### I. Evidence found inside Froman's vehicle

{¶ 23} An evidence technician with the OSHP recovered a Hi-Point .40-caliber semiautomatic pistol from Froman's vehicle containing a magazine with four rounds of ammunition in it and a live round jammed in the firearm. Six spent shell casings, three intact projectiles, two live rounds, and a bullet jacket were recovered from inside the vehicle.

### J. Forensic testing

{¶ 24} Matthew White, a firearms examiner with the Ohio Bureau of Criminal Investigation, examined the gun found in Froman's vehicle, determined that it was operable, and concluded that the spent shell casings recovered from the vehicle had been fired by that gun. White also determined that the spent shell casing found near Eli's body had been fired by the same gun. White compared test bullets that he had fired through the gun with the bullet recovered from Eli's body. Those comparisons revealed similar class characteristics (i.e., the caliber, the number and width of the lands and grooves, and the direction of the twist). However, there were insufficient characteristics present to identify or eliminate the bullet as having been fired by the gun.

### K. Autopsy results

{¶ 25} Dr. Amy Burrows-Beckham, an assistant medical examiner with the state of Kentucky, conducted the autopsy of Eli's body. Eli had been shot in the back of his head, his abdomen, and his right forearm. Dr. Burrows-Beckham testified that the pattern of stippling around the abdominal entrance wound showed that the gun had been fired from a distance of "about six inches." She concluded that gunshot wounds had caused Eli's death.

{¶ 26} Dr. Susan Allen, a forensic pathologist with the Montgomery County Coroner's Office, conducted the autopsy of Thomas's body. Thomas had been shot in the back of her head, her right upper chest, her right breast, and her right upper abdomen. Thomas had also suffered blunt force trauma to her torso, inner thighs,

and extremities, a laceration on her upper lip, three lacerations on the top of her head, and abrasions on her forehead and right cheek. She had a broken jaw and one of her lower teeth had been knocked out. Dr. Allen determined that Thomas had died from multiple gunshot wounds.

## II. PROCEDURAL HISTORY

{¶ 27} The state charged Froman with two counts of aggravated murder. Count 1 charged him with the aggravated murder of Thomas with prior calculation and design. Count 2 charged him with the aggravated murder of Thomas while committing a kidnapping. Both counts contained two death-penalty specifications: (1) committing aggravated murder as part of a course of conduct involving the purposeful killing of two or more persons (Thomas and Eli), R.C. 2929.04(A)(5); and (2) committing aggravated murder during the commission of a kidnapping, R.C. 2929.04(A)(7). Counts 3 and 4 charged Froman with kidnapping Thomas. All counts included a firearm specification.

{¶ 28} Froman pleaded not guilty to all the charges. The jury found Froman guilty of all the counts and specifications in the indictment.

{¶ 29} The state elected to proceed to the mitigation phase on Count 1 and its accompanying specifications. Following the mitigation phase, the jury recommended a sentence of death and the trial court subsequently sentenced Froman to death.

{¶ 30} As to the noncapital offenses, the trial court merged Counts 3 and 4 for the purposes of sentencing. Froman was sentenced to 11 years on Count 3 and to 6 years on the remaining specifications, for a total of 17 years on the noncapital offenses.

## III. ISSUES ON APPEAL

{¶ 31} Froman raises 14 propositions of law. We will address the issues involved in those propositions of law in the approximate order that they arose during Froman's trial.

**A. Jurisdiction**

{¶ 32} In proposition of law No. 1, Froman argues that the trial court lacked jurisdiction over the course-of-conduct death-penalty specifications because Eli was murdered in Kentucky.

*1. Relevant statutes*

{¶ 33} R.C. 2901.11, Ohio's criminal-law-jurisdiction statute, states the following:

> (A) A person is subject to criminal prosecution and punishment in this state if any of the following occur:
>
> (1) The person commits an offense under the laws of this state, any element of which takes place in this state.
>
> * * *
>
> (B) In homicide, the element referred to in division (A)(1) of this section includes the act that causes death, the physical contact that causes death, the death itself, or *any other element that is set forth in the offense in question.* If any part of the body of a homicide victim is found in this state, the death is presumed to have occurred within this state.

(Emphasis added.)

{¶ 34} R.C. 2929.04 sets forth the aggravating circumstances that must be specified in the indictment and proved by the state beyond a reasonable doubt in order for a court to impose the death penalty for an aggravated-murder offense. Relevant here, the course-of-conduct specification in R.C. 2929.04(A)(5) states the following:

(A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:

\* \* \*

(5) Prior to the offense at bar, the offender was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another, or the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender.

### 2. *Analysis*

{¶ 35} Froman argues that the trial court lacked jurisdiction over the course-of-conduct specification because Eli's murder had taken place in Kentucky and none of the elements of that offense occurred in Ohio. Froman's argument presumes that the course-of-conduct specification constituted a separate offense. But R.C. 2929.04 does not define separate offenses; it sets forth aggravating circumstances that the state must prove beyond a reasonable doubt in order for the trial court to impose the death penalty for an aggravated-murder offense. Indeed, both this court and the United States Supreme Court have held that aggravating circumstances do not constitute separate offenses. *See, e.g.*, *State v. Dennis*, 79 Ohio St.3d 421, 432, 683 N.E.2d 1096 (1997) ("specifications required for the imposition of the death penalty do not, in and of themselves, constitute separate criminal offenses"); *Poland v. Arizona*, 476 U.S. 147, 156, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986) ("Aggravating circumstances are not separate penalties or offenses"); *see also Commonwealth v. Mattison*, 623 Pa. 174, 200-201, 82 A.3d 386 (2013) (same); *State v. Simmons*, 955 S.W.2d 752, 759-760 (Mo.1997) (same).

{¶ 36} Under R.C. 2901.11(A)(1), a trial court in Ohio has criminal-law jurisdiction over a person who has committed an offense when any element of the offense occurred in Ohio. Here, the offense was the aggravated murder of Thomas, which had occurred in Warren County, Ohio. Thus, the trial court had jurisdiction over the offense of Thomas's murder and its accompanying course-of-conduct specifications. The fact that the course-of-conduct specification included the murder of Eli that had occurred in Kentucky did not divest Ohio of jurisdiction over the offense of Thomas's murder.

{¶ 37} Froman cites this court's decision in *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845, in arguing that he could not have been properly tried in Ohio for the course of conduct involving Eli's murder in Kentucky. But the facts in *Yarbrough* are distinguishable from those in this case and the General Assembly has amended Ohio's criminal-jurisdiction statute since *Yarbrough* was decided.

{¶ 38} In *Yarbrough*, the defendant had kidnapped two college students in Ohio and later murdered them in Pennsylvania. *Id.* at ¶ 6, 9-10. This court held that Ohio lacked jurisdiction to try the defendant for those out-of-state murders. *Id.* at ¶ 44. But our decision in *Yarbrough* relied on former R.C. 2901.11, the criminal-jurisdiction statute that was in effect at the time of the murders in that case. *Id.* at ¶ 42-44. Former R.C. 2901.11(B) provided, "In homicide, the element referred to in division (A)(1) of this section is either the act which causes the death, or the physical contact which causes death, or the death itself." Am.Sub.H.B. No. 565, 147 Ohio Laws, Part II, 4493, 4498.

{¶ 39} But R.C. 2901.11 was amended in 2005 after *Yarbrough* had been decided and prior to the offenses that took place in this case. In that amendment, the General Assembly expanded R.C. 2901.11(B) to state, "In homicide, the element referred to in division (A)(1) of this section includes the act that causes death, the physical contact that causes death, the death itself, *or any other element*

*that is set forth in the offense in question.*" (Emphasis added.) Am.Sub.S.B. No. 20, 151 Ohio Laws, Part I, 10, 11. The General Assembly also added an uncodified provision "declar[ing] that it intends by the amendments * * * of this act to prospectively overrule the decision of the Ohio Supreme Court in *State v. Yarbrough* (2004), 104 Ohio St.3d 1." Section 3, 151 Ohio Laws, Part I, at 15. Accordingly, *Yarbrough* does not control our decision here.

{¶ 40} Based on the foregoing, we reject proposition of law No. 1.

### B. Evidence relating to Eli's murder in Kentucky

{¶ 41} In proposition of law No. 2, Froman argues that even assuming that Ohio had jurisdiction over the course-of-conduct specification, the trial court abused its discretion in admitting evidence relating to Eli's murder because it was inadmissible "other acts" evidence.[1] Froman objected to this evidence during pretrial hearings and the trial court overruled those objections.

{¶ 42} Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 43} Two counts in the indictment included a course-of-conduct specification alleging that Froman had murdered Eli as part of a course of conduct involving "the purposeful killing of or attempt to kill two or more persons." R.C. 2929.04(A) specifically requires that capital specifications be proved beyond a reasonable doubt. *See also State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 72; *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 51. Thus, the evidence that Froman had murdered Eli in

---

1. Froman also specifically attacks in his other-acts-evidence challenge the trial court's admission of "graphic, gruesome" crime-scene photographs of Eli. This claim will be addressed below in our analysis of proposition of law No. 10.

Kentucky was admissible to prove the course-of-conduct specification and was not prohibited other-acts evidence intended to prove Froman's character or that he had acted in conformity with that character. Accordingly, the trial court did not abuse its discretion in overruling Froman's objections to the alleged other-acts evidence.

{¶ 44} Froman also argues that the evidence relating to Eli's murder was admitted in violation of Evid.R. 403. Evid.R. 403(A) states that a trial court must exclude evidence, regardless of its relevance, if "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." "Unfairly prejudicial evidence usually appeals to the jury's emotions, rather than to intellect." *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 112. "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

{¶ 45} Froman argues that the sole purpose of the evidence relating to Eli's murder in Kentucky was the "emotional presentation" of the murder of a "17-year-old son coming to [his] mother's aid" and that it was intended "to tug at the jury's heartstrings rather than [its] intellect." But the state had to prove that Froman had purposely killed Eli in order to prove the course-of-conduct specification. Even assuming that Froman's characterization of the evidence is reasonable, the probative value of the evidence substantially outweighed any danger of unfair prejudice, confusion of the issues, or of misleading the jury. Evid.R. 403(A); *see Thompson* at ¶ 113-114.

{¶ 46} The trial court did not explicitly state its findings regarding its application of Evid.R. 403(A). However, we have stated that "Evid.R. 403(A) establishes a standard but does not require a trial court to explicitly state in its judgment entry that the probative value of the 'other acts' evidence outweighs it prejudicial impact." *State v. Bey*, 85 Ohio St.3d 487, 489, 709 N.E.2d 484 (1999).

Thus, the trial court's failure to explicitly state its findings regarding its weighing process under Evid.R. 403(A) was not error.

**{¶ 47}** Based on the foregoing, we reject proposition of law No. 2.

### C. Biased jurors

**{¶ 48}** In proposition of law No. 3, Froman argues that the seating of juror Nos. 5, 13, 46, and 49 violated his right to a fair and impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution because those jurors had expressed racial bias on their juror questionnaires or during voir dire. Froman additionally argues that juror No. 49 had also expressed bias in favor of the death penalty. Froman additionally argues in proposition of law No. 4 that his counsel were ineffective for failing to question or remove juror No. 49 from the panel during voir dire.

### 1. Racial bias

**{¶ 49}** "Pursuant to the Sixth and Fourteenth Amendments, a criminal defendant is guaranteed the right to an impartial and unbiased jury." *Miller v. Webb*, 385 F.3d 666, 672 (6th Cir.2004); *see also Morgan v. Illinois*, 504 U.S. 719, 727, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Voir dire serves the purposes of allowing the court and the parties to identify and remove jurors to ensure an impartial jury. *Miller* at 672. Although counsel and the trial court have broad discretion in determining a juror's ability to be impartial, *State v. White*, 82 Ohio St.3d 16, 20, 693 N.E.2d 772 (1998), "the decision whether to seat a biased juror cannot be a discretionary or strategic decision," *Miller* at 675. Thus, when a juror who has exhibited actual bias against a defendant is seated on the jury, the defendant's Sixth Amendment right to an impartial jury has been violated.

**{¶ 50}** "Actual bias is 'bias in fact'—the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997); *see also United States v. Wood*, 299 U.S. 123, 133, 57 S.Ct. 177, 81 L.Ed. 78 (1936). Actual bias can be shown by a

juror's express admission or circumstantial evidence of the juror's biased attitude. *Hughes v. United States*, 258 F.3d 453, 459 (6th Cir.2001). For example, courts have found actual bias when a juror unequivocally stated that she could not be fair due to her law-enforcement bias, *id*. at 459-460, when jurors had fixed opinions of the defendant's guilt based on pretrial publicity, *Irvin v. Dowd*, 366 U.S. 717, 727-728, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), and when a juror expressed views on the death penalty that " 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath," ' " *Morgan* at 728, quoting *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

{¶ 51} For a defendant's conviction to be reversed for ineffective assistance of counsel, the defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *accord State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

{¶ 52} In *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, ¶ 25-26, we recently clarified a court's duties when applying the prejudice prong under *Strickland* in the context of counsel's failure to address juror bias. To demonstrate prejudice, the defendant " ' "must show that [a] juror was actually biased against him." ' " *Id.* at ¶ 25, quoting *State v. Mundt*, 115 Ohio St.3d 22, 2007-Ohio-4836, 873 N.E.2d 828, ¶ 67, quoting *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir.2001). "[A]ctual racial bias may be present without a demonstration of bias against the defendant *personally* if the juror's statement rises to a level of generality about a racial or ethnic group that indicates the juror's inability to be impartial in the particular case before him or her." (Emphasis sic.) *Id.* at ¶ 35.

### a. Juror No. 49

{¶ 53} Froman argues that juror No. 49's responses on her juror questionnaire and during voir dire clearly show that she was racially biased. Question No. 50 on the general juror questionnaire asked the potential jurors about "the issue of racial discrimination against African-Americans in our society." Juror No. 49 checked a box under that question indicating that it is "not a problem." She responded affirmatively to another question asking, "Have you ever had a negative or frightening experience with a person of another race?" She clarified in writing that "an African-American male approach[ed] our training center at night and call[ed] us names and made derogatory remarks." The questionnaire asked if she agreed with a comment stating that "[s]ome races and/or ethnic groups tend to be more violent than others," and juror No. 49 checked the box corresponding to the answer "Strong[ly] agree." She explained in writing, "Statistics show * * * more black people commit crimes. And certain religions have violent beliefs."

{¶ 54} During small-group voir dire, the prosecutor asked juror No. 49 about her views on race:

[Prosecutor]: As you will remember from filling out those 23 page questionnaires a while back, there were numerous questions on there about race. And one of the reasons that there were questions about race on there is because nobody wants someone on this jury who would automatically vote for the death penalty because an African American is accused of killing a white person. Does that make sense to everybody?

* * *

I also want to make sure that we do not have any jurors who would be reluctant to consider the death penalty in this case for fear that you may be perceived as being racist or making your decision

based on race given the fact that the Defendant is African American and the victim is white.

[Juror No. 49], would you have any concerns that you would be reluctant to consider the death penalty in this case for fear of how you or the jury as a whole may be perceived based on the fact that the Defendant is African American and the victims are white?

[Juror No. 49]:  No.

[Prosecutor]:  Do you agree that race should not play any role in the decisionmaking process whatsoever?

[Juror No. 49]:  I totally agree.

Defense counsel did not inquire about juror No. 49's views on race and she was seated on the jury.

{¶ 55} Juror No. 49's questionnaire responses indicated that she had racially-biased views, particularly her statement that "statistics show * * * more black people commit crimes."  As we observed in *Bates*, a juror's predisposition about a person's propensity for violence based on the person's race is an express admission of racial bias.  159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, at ¶ 39, fn. 3.  Unlike in *Bates*, however, when the prosecutor here questioned juror No. 49 about the impact of her views on race on her ability to be an impartial juror, she unequivocally agreed with the prosecutor that race should not play any role in the decisionmaking process.

{¶ 56} In deciding whether a defendant has proved that a juror was actually biased, a court may consider the juror's assurances of impartiality.  *Hughes*, 258 F.3d at 459-460.  The standard for juror impartiality has been described as follows:

"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to

rebut the presumption of a prospective juror's impartiality would be
to establish an impossible standard.  It is sufficient if a juror can lay
aside his impression or opinion and render a verdict based on the
evidence presented in court."

*Id.* at 459, quoting *Irvin*, 366 U.S. at 723, 81 S.Ct. 1639, 6 L.Ed.2d 751.

{¶ 57} On the whole, we conclude that juror No. 49's responses on her general questionnaire do not show her inability to be impartial in this case, based on her assurance during voir dire that she could set aside her opinions on race and decide the case based on the evidence.  When the prosecutor asked juror No. 49 if she agreed that race should not play any role in the decisionmaking process whatsoever, she responded, "I totally agree."  In light of this assurance of impartiality, the record does not support Froman's argument that juror No. 49 was actually biased against him.  Thus, we reject Froman's claim in proposition of law No. 3 that he was denied his right to an impartial jury due to the seating of juror No. 49.  For the same reason, we reject Froman's ineffective-assistance claim in proposition of law No. 4 with respect to juror No. 49.

### b. Juror Nos. 5, 13, and 46

{¶ 58} Froman argues that juror Nos. 5, 13, and 46, all of whom were seated on the jury, expressed racial bias in their responses to questions on their jury questionnaires.  On the general questionnaire, question No. 54 presented a comment stating, "Some races and/or ethnic groups tend to be more violent than others" and directed the jurors to select one of five possible answers.  Jurors Nos. 5, 13, and 46 each checked the box corresponding to the response "Agree."  Although the questionnaire provided space for a written explanation, none of these jurors provided any explanation for their answers or identified a particular race or ethnic group.  Froman argues that his trial counsel or the trial court should have questioned

these jurors to follow up on their "blatantly expressed racial views expressed in the questionnaires."

{¶ 59} Other responses on the questionnaires of juror Nos. 5, 13, and 46 indicated that they had more neutral or sensitive views on the topic of race than indicated by their responses to question No. 54. For example, question No. 52 asked, "Have you ever had a negative or frightening experience with a person of another race?" All three jurors responded with the answer "No." Question No. 53 asked, "Have you ever been exposed to persons who exhibited racial, sexual, religious, and/or ethnic prejudice?" Juror No. 13 responded affirmatively, explaining, "Friends using words that shouldn't be used." Question No. 50 asked about "the issue of racial discrimination against African-Americans in our society." Juror No. 46 checked a box indicating she believed it is "[a] very serious problem."

{¶ 60} Juror Nos. 5, 13, and 46 were not individually questioned during voir dire about their questionnaire responses or their views on race. But during small-group voir dire, juror Nos. 5 and 13 expressed agreement when the prosecutor asked their small-group panel: "Do all of you agree that race should not play any role in the decisionmaking process whatsoever?"

{¶ 61} We do not agree that, as Froman argues, the questionnaire responses of juror Nos. 5, 13, and 46 demonstrate "blatantly expressed racial views." The record does not demonstrate that the jurors were unable to be impartial, and Froman has not established they were actually biased against him. We reject Froman's arguments under proposition of law No. 3 with respect to juror Nos. 5, 13, and 46.

*2. Death-penalty bias*

{¶ 62} Additionally, Froman argues that juror No. 49 was biased in favor of the death penalty and that he was denied his right to an impartial jury as a result.

{¶ 63} A prospective juror in a capital case may be excused for cause if his views on capital punishment would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his

oath.' " *Wainwright*, 469 U.S. at 424, 105 S.Ct. 844, 83 L.Ed.2d 841, quoting *Adams*, 448 U.S. at 45, 100 S.Ct. 2521, 65 L.Ed.2d 581. If a juror would "automatically vote for the death penalty in every case," the juror cannot be fair and impartial because he "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Morgan*, 504 U.S. at 729, 112 S.Ct. 2222, 119 L.Ed.2d 492. "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.*

**{¶ 64}** Juror No. 49 first indicated her attitude toward the death penalty on her case-specific juror questionnaire. In response to a question asking "[w]hich of the following best reflects your view of the death penalty," juror No. 49 checked a box indicating she believed that the death penalty is "[a]ppropriate with very few exceptions where someone has been murdered." In response to the statement, "The death penalty should **always** be used as the punishment for every murder," juror No. 49 checked a box labeled "Slightly disagree." (Boldface sic.)

**{¶ 65}** During small-group voir dire, the trial court asked juror No. 49 about her views on the death penalty.

> [The Court]: Are you in favor of the death penalty in every case where a murder is committed?
>
> [Juror No. 49]: Yes.
>
> [The Court]: Okay. So you are saying that if you are selected as a juror and the murder is proven, you're going to automatically vote—tell me what your position is. You're going to automatically vote in favor of the death penalty, period, if a murder is proven?
>
> [Juror No. 49]: I don't know if I would say automatically, but very strongly.

**{¶ 66}** During further voir dire, the prosecutor questioned juror No. 49 to determine whether she would automatically vote for the death sentence if Froman were to be convicted of aggravated murder:

> [Prosecutor]: [Juror No. 49], I know that you indicated that you were strongly in favor of the death penalty. Is it fair to say, though, would you listen to any mitigating factors that the Defense may put forward in this case and weigh those mitigating factors against any aggravating circumstances that you find?
>
> [Juror No. 49]: I would but if I'm being honest, it would be really hard for me to not see the death penalty as a proper punishment.
>
> [Prosecutor]: And that's okay. * * * But the main thing that I want to understand, I understand that you would lean in favor of the death penalty, but you would be willing to consider anything that was brought before you as potentially a mitigating factor or an aggravating circumstance and at least engage in the weighing process. Is that fair to say?
>
> [Juror No. 49]: That's fair to say, yes.

**{¶ 67}** Juror No. 49 provided contradictory responses to questions about the automatic imposition of the death penalty in murder cases on her questionnaire and during voir dire. But we have noted that prospective jurors often have difficulty articulating their views during voir dire. *See, e.g.*, *State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 90. "[I]t is not uncommon for jurors to express themselves in contradictory and ambiguous ways" during voir dire, "both due to unfamiliarity with courtroom proceedings * * * and because the jury pool

runs the spectrum in terms of education and experience." *White v. Mitchell*, 431 F.3d 517, 537 (6th Cir.2005); *see also Patton v. Yount*, 467 U.S. 1025, 1039, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984).

{¶ 68} In this case, juror No. 49's questionnaire responses reflected some uncertainty about whether she thought that the death penalty was appropriate in every case in which a murder had been proved. In response to the prosecutor's follow-up questions, however, juror No. 49 indicated her willingness to consider mitigating evidence and to engage in the process of weighing the mitigating factors and aggravating circumstances in spite of her views in favor of the death penalty. Thus, the prosecutor obtained her assurance that she could be impartial. *See Hughes*, 258 F.3d at 459-460. Accordingly, the record does not show that juror No. 49 was actually biased in favor of the death penalty. We reject proposition of law No. 3 with respect to Froman's argument that Juror No. 49 exhibited such bias.

### D. Shackling

{¶ 69} In proposition of law No. 9, Froman argues that the trial court denied him his rights to due process and a fair trial under the United States and Ohio Constitutions by requiring him to wear leg shackles during the trial.

{¶ 70} Absent unusual circumstances, no one should be tried while shackled. *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 82; *Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). The use of restraints tends to erode the presumption of innocence that the justice system attaches to every defendant. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 79. But it is widely accepted that a defendant may be shackled when there is a danger of violence or escape. *State v. Woodards*, 6 Ohio St.2d 14, 23, 215 N.E.2d 568 (1966). The decision to require a defendant to wear restraints is left to the sound discretion of the trial court, which is in a position to consider the defendant's actions both inside and outside the courtroom, as well as his demeanor while the court is in session. *Franklin* at ¶ 79.

*1. Rulings on restraints*

{¶ 71} Before trial, the trial court held a hearing on Froman's motion requesting that he be permitted to appear at all court proceedings without restraints. Major Barry Riley, the jail administrator for the Warren County Sherriff's Office, testified that the sheriff's office initially classified Froman as a "medium maximum" security risk because he had been charged with a "very violent felony" that involved interstate fleeing and had shot himself. But Froman's security classification had later been increased, because "holders" had been placed on him for capital crimes committed in Kentucky. Riley also testified that Froman had hit another inmate in the head and had entered another inmate's cell and "took commissary that was owed to him." Riley recommended that Froman remain in "full level restraints" while in court.

{¶ 72} After the hearing, the trial court issued an order establishing a security protocol for Froman's court attendance. The court determined that "[b]ased on the evidence and arguments of counsel, * * * the nature of the proceedings and the specific security risks posed by this Defendant require a higher level of security." Accordingly, the court ordered that Froman be transported to and from the courtroom in restraints. The courtroom was to be cleared of the public before Froman entered, any restraints other than leg restraints were to be removed before the public was readmitted, and the courtroom was to be cleared again at the close of the proceedings prior to Froman's departure. The court further directed that a "modesty panel" be placed under both counsel tables to "obscure the leg restraints from the view of the jury." Finally, the court determined that the protocols established by its order were the "least restrictive means of security and restraint available."

*2. Analysis*

{¶ 73} Under the circumstances of this case, the trial court did not abuse its discretion in ordering Froman to wear leg restraints during trial. *See State v. Myers*,

154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 44.  Froman has also not shown that his due-process rights were violated.  Due process "prohibit[s] the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629, 125 S.Ct. 2007, 161 L.Ed.2d. 953 (2005).  "[A] claim based on *Deck* 'rises or falls on the question of whether the [restraining device] was visible to the jury.' " *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 842 (6th Cir.2017), quoting *Earhart v. Konteh*, 589 F.3d 337, 349 (6th Cir.2009).  Here, the trial court's protocol ensured that the shackles were not visible to the jury, and nothing in the record indicates otherwise. *See Myers* at ¶ 44.

{¶ 74} Froman claims that the jury was aware of the shackles because the shackles "made noise and clanked."  However, defense counsel never complained that the shackles made noise during the trial.  Thus, Froman's claim that the jury was aware of the shackles is mere speculation.  *See id*. at ¶ 46.

{¶ 75} Froman also complains that the leg shackles inhibited his ability to effectively participate in  his defense and to interact with his defense counsel. However, neither Froman nor his defense counsel ever asserted at trial that Froman's restraints interfered with their attorney-client relationship.  Froman has therefore forfeited all but plain error regarding that argument.  Crim.R. 52(B); *see Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, at ¶ 106.  We hold that no plain error occurred.  Nothing in the record indicates that Froman's leg restraints inhibited his communication with counsel or his ability to participate in his defense.  Moreover, both of Froman's hands were unrestrained throughout trial.

{¶ 76} Finally, Froman claims that his being in leg shackles all day while in court affected his mental concentration and physical comfort.  But Froman never made those complaints during trial and, on the record before us, we cannot conclude that plain error occurred.

{¶ 77} Based on the foregoing, we reject proposition of law No. 9.

### E. Crim.R. 16(K) compliance

{¶ 78} In proposition of law No. 6, Froman argues that the trial court erred by allowing Jeffrey Brenner, an audiovisual-forensics analyst with the Ohio Attorney General's Office, to provide expert testimony about the videotaped recordings of the phone calls between Froman and Clark, because the state did not comply with Crim.R. 16(K) prior to trial.

{¶ 79} Crim.R. 16(K) precludes the testimony of an expert witness for either party unless the expert has prepared a written report and summary of the expert's qualifications and the report and summary are disclosed to the opposing party "no later than twenty-one days prior to trial."

{¶ 80} On the first day of voir dire, Froman's defense counsel requested the trial court to exclude Brenner's testimony, because the state had failed to provide the defense with Brenner's "Forensic Tape Analysis Video Laboratory Report" 21 days before trial as required by Crim.R. 16(K). In the alternative, Froman's defense counsel requested a continuance so that the defense could hire an expert to review Brenner's report.

{¶ 81} The prosecutor responded that Brenner was not an expert witness; rather, the prosecutor said that Brenner was an "audiovisual representative" who enhanced the videotaped recording of the phone conversations between Froman and Clark by (1) filtering out extraneous noises and sounds, (2) deleting extraneous conversations that had occurred between the phone calls, and (3) adding closed captioning to help the jurors understand the conversations. The prosecutor told the court that Brenner was going to describe the edits that he had made to the videotape and that he was not going to render an opinion on anything at all.

{¶ 82} The trial court overruled Froman's objection under Crim.R. 16(K), concluding that the state would not be calling Brenner as an expert witness. The trial court also denied Froman's request for a continuance.

**{¶ 83}** During the state's case-in-chief, Brenner testified that he had enhanced the audio quality of the videotape by using a "declicker tool to remove click pop noises," by using a graphic equalizer to lower background noises, and by using a "Fast Fourier Filter to increase the volume of the spoken dialogue." He also added closed captioning to the videotape after the prosecutor had provided him with the text to be added. And he deleted segments of the videotape that he had been instructed to remove.

**{¶ 84}** During cross-examination, Brenner testified that he had been qualified as an expert witness in one of the three previous cases in which he had testified. Brenner considered himself to be an expert, because a person without his training would not be able to enhance the audio quality of the recordings, add closed captioning to them, or remove sections from the videotape.

**{¶ 85}** Following Brenner's testimony, Clark testified that state's exhibit No. 51, which was the final enhanced videotape, fairly and accurately represented the conversations that he had had with Froman. State's exhibit No. 51 was then played for the jury. The trial court later instructed the jury that the closed captioning in the videotape had been provided to assist it in following the conversations and was not evidence. The trial court also told the jury that "[i]f you find there is a conflict between the subtitles and recording, it is the recording that controls."

**{¶ 86}** Froman renewed his objections to Brenner's testimony, the exhibits identified by him, and the videotape and the conversations therein, and he moved for a mistrial. The trial court overruled his objections and denied his motion for a mistrial.

**{¶ 87}** As an initial matter, we must determine whether Brenner testified as an expert. Expert testimony is defined in Evid.R. 702, and the determination of the admissibility of expert testimony under Evid.R. 702 is entrusted to the trial court's discretion. *Valentine v. Conrad*, 110 Ohio St.3d 42, 2006-Ohio-3561, 850 N.E.2d 683, ¶ 9. The determination is a preliminary issue under Evid.R. 104(A), which

requires the trial court to determine preliminary questions concerning the admissibility of evidence.

{¶ 88} Froman argues that Brenner was an expert witness because he "interpret[ed]" the original videotape. But Brenner did not render an opinion as to what words were spoken on the videotape. Rather, Brenner provided factual testimony as to the enhancements and deletions and the addition of closed captioning that he had performed to assist the jury in reaching a clear understanding of the videotape.

{¶ 89} Froman also argues that the trial court should have qualified Brenner as an expert witness because the average person could not perform his job duties. However, "whether a witness must be qualified as an expert is based on the content of the testimony rather than by the means in which it was obtained." *State v. Fread*, 12th Dist. Butler No. CA2013-03-045, 2013-Ohio-5206, ¶ 15. Moreover, the fact that Brenner had been qualified as an expert witness in a previous case did not automatically render him an expert witness in this case.

{¶ 90} We conclude that the trial court did not abuse its discretion in ruling that Brenner was a lay witness. As such, we do not reach Froman's argument that the state's failure to comply with Crim.R. 16(K) should have precluded Brenner's testimony. Based on the foregoing, we reject proposition of law No. 6.

### F. Denial of a continuance

{¶ 91} In proposition of law No. 7, Froman argues that the trial court abused its discretion by denying his request for a continuance to obtain his own expert witness to examine the enhanced videotape. The determination whether to grant a continuance is entrusted to the broad discretion of the trial court. *State v. Unger*, 67 Ohio St.2d 65, 67, 423 N.E.2d 1078 (1981), syllabus. Relevant factors include the length of the delay requested, whether there had been prior continuances, inconvenience, and the reasons for the delay. *State v. Landrum*, 53 Ohio St.3d 107, 115, 559 N.E.2d 710 (1990).

{¶ 92} Froman argues that a continuance was necessary to give the defense time to hire its own expert to examine the enhanced videotape. However, as discussed regarding proposition of law No. 6, Brenner was not an expert witness. Moreover, Clark, who was a party to the recorded phone conversations, and Officer Montgomery, who was present during those phone calls, reviewed the enhanced videotape and testified that its contents were a fair and accurate representation of what had been said during the conversations. Thus, Froman has not shown that he had a valid, specific need for a defense expert to examine the enhanced videotape. *See State v. Spirko*, 59 Ohio St.3d 1, 18, 570 N.E.2d 229 (1991) (holding that trial court did not abuse its discretion by denying defendant's request for a continuance because defendant failed to show a "particularized need" for the continuance).

{¶ 93} The inconvenience that a continuance would have caused also supports the trial court's denial of Froman's request. The defense did not specify how much time it would have needed to hire an expert to examine the videotape. By the time that Froman had made the request, the venire had already been summoned and a continuance could have delayed the beginning of the trial. Further, at least two lengthy defense-requested delays had already been granted, and another lengthy delay was granted after Froman had filed a pro se motion to remove his counsel and new counsel were appointed.

{¶ 94} Considering all these factors, we conclude that the trial court did not abuse its discretion by denying Froman's motion for a continuance. Based on the foregoing, we reject proposition of law No. 7.

### G. Admissibility of Froman's videotaped conversations

{¶ 95} In proposition of law No. 8, Froman argues that the trial court erred by allowing the jury to view multiple videotapes of his phone conversations with Clark and thereby violated his due-process rights and the best-evidence rule.

{¶ 96} As noted above in our analysis of proposition of law No. 6, Brenner enhanced the videotaped phone conversations between Clark and Froman. Brenner

testified that additional videotapes had also been prepared: state's exhibit No. 47 was the original videotape; state's exhibit No. 48 was the videotape with enhanced audio; state's exhibit No. 49 was the videotape with enhanced audio and closed captioning; state's exhibit No. 50 was the videotape with enhanced audio and deleted downtime; and state's exhibit No. 51 was the videotape with enhanced audio, closed captioning, and deleted downtime.

{¶ 97} Over Froman's objection, state's exhibit No. 51 was played for the jury, and state's exhibit No. 50 was admitted into evidence and sent back with the jury for its deliberations. The trial court explained that state's exhibit No. 50, which did not include the closed captioning, was being admitted to "leav[e] it to [the jurors'] own interpretation of what was said." State's exhibit Nos. 47 through 49 and 51 were not admitted into evidence, but they were included as part of the record for appellate purposes.

{¶ 98} As an initial matter, several aspects of Froman's argument are based on incorrect factual premises. He states that *three different videotapes* of the conversations were identified and *played for the jury* without being admitted into evidence. But only one videotape (state's exhibit No. 51) was played for the jury, and the jury was provided with only one videotape (state's exhibit No. 50) for its deliberations. And contrary to Froman's claim, the trial court never stated that the jury had seen videotape exhibits that were not admitted into evidence.

{¶ 99} Froman argues that even if only one video had been provided to the jury, the "problem is the same—the exhibit(s) played was not the one sent back to the jury." "Where there are no 'material differences' between a tape admitted into evidence and a transcript given to the jury as a listening aid, there is no prejudicial error." *State v. Waddy*, 63 Ohio St.3d 424, 445, 588 N.E.2d 819 (1992); *see State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 147-149 (videotape augmented by adding captioning is admissible if there are no "material differences" between the videotape and the captioning). Froman has failed to

identify any portion of the closed-captioned videotape that is inaccurate or any material differences between state's exhibit Nos. 50 and 51 other than the closed captioning.

{¶ 100} Froman also invokes Evid.R. 1002—the "best evidence" rule—which provides that to prove the contents of a writing, recording, or photograph, the original version must be introduced at trial unless an exception applies. But the best-evidence rule was not violated here because the closed-captioned videotape (state's exhibit No. 51) was not admitted into evidence. *See Waddy* at 445. Moreover, Froman has failed to show that he was prejudiced, because the trial court instructed the jurors to decide for themselves what Froman and Clark had said during their conversations.

{¶ 101} Based on the foregoing, we reject proposition of law No. 8.

### H. Gruesome autopsy photographs

{¶ 102} In proposition of law No. 10, Froman argues that the trial court erred in admitting into evidence gruesome autopsy photographs of Eli and Thomas.

{¶ 103} We have "strongly caution[ed] judicious use" of gruesome photographs in capital cases. *State v. Morales*, 32 Ohio St.3d 252, 259, 513 N.E.2d 267 (1987). To be admissible, "the probative value of each photograph must outweigh the danger of prejudice to the defendant and, additionally, not be repetitive or cumulative in nature." *Id*. at 258; *see also State v. Thompson*, 33 Ohio St.3d 1, 9, 514 N.E.2d 407 (1987). The admission of gruesome photographs is left to the trial court's sound discretion. *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 69.

*1. Eli's autopsy photographs*

{¶ 104} Over Froman's objection, the state introduced photographs of Eli's autopsy as state's exhibit Nos. 126 through 145. Dr. Burrows-Beckham, an assistant medical examiner, used the photographs to highlight her testimony about Eli's autopsy.

{¶ 105} First, we note that state's exhibit Nos. 128, 129, and 135 through 138—which depict Eli's foot with a toe tag on it, an X-ray of Eli's arm, the gunshot wound to Eli's forearm, and the recovered projectile itself—are not gruesome, and therefore there was no error in admitting them into evidence.

{¶ 106} Second, we conclude that the probative value of each of the remaining gruesome photographs of Eli's autopsy, which were introduced for the purpose of aiding the testimony of Dr. Burrows-Beckham concerning the nature of Eli's death, outweighed the danger of any prejudice to Froman. *See Morales*, 32 Ohio St.3d at 258, 513 N.E.2d 267. However, we conclude that certain of the photographs are repetitive. Specifically, state's exhibit Nos. 126 and 127, which depict the destructive nature of Eli's head wounds, and State's exhibit Nos. 130 and 131, which supported Dr. Burrows-Beckham's testimony that Eli had been on his stomach for approximately five hours before his body was discovered, are repetitive. We conclude that only one photograph from each pair of those photographs should have been admitted into evidence. Nevertheless, this error was harmless beyond a reasonable doubt considering the overwhelming evidence of Froman's guilt. *See Thompson*, 33 Ohio St.3d at 9, 514 N.E.2d 407.

### 2. *Thomas's autopsy photographs*

{¶ 107} Over Froman's objection, the state introduced photographs of Thomas's autopsy as state's exhibit Nos. 148 through 181. Dr. Allen, a forensic pathologist, used the photographs to describe her autopsy findings.

{¶ 108} First, we conclude that state's exhibit Nos. 174 through 181 are not gruesome, and therefore there was no error in admitting them into evidence.

{¶ 109} Second, we note that two photographs of Thomas's autopsy had little, if any, probative value. State's exhibit No. 148 depicts Thomas's body prior to the autopsy, but it does not clearly show Thomas's wounds. State's exhibit No. 171 shows Thomas's vaginal area, and it has no probative value because no sex

offense was charged in this case. We conclude that neither of those photographs should have been admitted into evidence.

{¶ 110} Next, we conclude that the probative value of each of the remaining gruesome photographs of Thomas's autopsy outweighed the danger of any prejudice to Froman, because they aided the testimony of Dr. Allen concerning the nature of Thomas's death and Froman's intent. *See Morales*, 32 Ohio St.3d at 258, 513 N.E.2d 267. However, certain of the photographs are repetitive and should not have been admitted into evidence. Specifically, state's exhibit Nos. 158 and 159, which each show a gunshot wound to Thomas's head, are repetitive and only one of them should have been admitted into evidence. State's exhibit Nos. 150 through 152 and 154 through 156, which each show Thomas's facial injuries, are also repetitive and only the last three photographs from that group should have been admitted into evidence. Additionally, state's exhibit No. 170 is a cumulative photograph of multiple wounds and it should not have been admitted into evidence.

{¶ 111} We hold that any error in the admission of the repetitive and cumulative photographs, or in the admission of the photographs lacking probative value, was harmless beyond a reasonable doubt considering the overwhelming evidence of Froman's guilt. *See Thompson*, 33 Ohio St.3d at 9, 514 N.E.2d 407.

{¶ 112} Based on the foregoing, we reject proposition of law No. 10.

### I. Prosecutorial misconduct

{¶ 113} In proposition of law No. 5, Froman argues that his judgment of conviction and death sentence should be reversed due to the prosecutor's misconduct during the mitigation phase of the trial.

{¶ 114} When reviewing a claim of prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431

(1974). To answer that question, we consider whether the conduct was improper and, if so, whether it prejudicially affected the defendant's substantial rights. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 243. In evaluating whether the outcome of Froman's trial was prejudiced, we consider the effect that the misconduct had "on the jury in the context of the entire trial." *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).

*1. "Badgering" the defense psychologist*

{¶ 115} Froman argues that the prosecutor committed misconduct by "badgering" one of his mitigation witnesses, Dr. Nancy Schmidtgoessling, during the prosecutor's cross-examination of her.

{¶ 116} Evid.R. 611(B) provides that cross-examination shall be permitted on all relevant matters and matters affecting credibility. "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *State v. Acre*, 6 Ohio St.3d 140, 145, 451 N.E.2d 802 (1983).

{¶ 117} Dr. Schmidtgoessling, a clinical psychologist, testified about IQ tests and behavioral and psychological tests that she administered to Froman. She testified that Froman became distressed after his relationship with Thomas had ended. Froman was also upset because he was unemployed and he believed that Thomas owed him money. Dr. Schmidtgoessling concluded her testimony by stating:

> [T]his is really a domestic violence case. I understand the person died horribly. * * * The intertwinement of the relationship with his mental state is so powerful and unfortunately we see this. This type of offense is not that uncommon, sadly.

**{¶ 118}** First, Froman argues that the prosecutor badgered and embarrassed Dr. Schmidtgoessling by asking her whether she knew that "*two* people died horribly." (Emphasis added.) Dr. Schmidtgoessling replied in the affirmative. However, defense counsel failed to object and, therefore, Froman has forfeited all but plain error on that issue. And here, the prosecutor was merely following up on Dr. Schmidtgoessling's testimony regarding her understanding of the number of people who Froman had killed. We conclude that the prosecutor committed no plain error in asking this question.

**{¶ 119}** Froman's reliance on *Slagle v. Bagley*, 457 F.3d 501 (6th Cir.2006), is unpersuasive. In *Slagle*, the court determined that the prosecutor had made multiple comments during closing arguments that belittled the defense witnesses (e.g., referring to the defense expert's opinions as "liberal quack theories" and stating that another defense witness "crawled out of a hole"). *Id.* at 522. But misconduct of that type did not occur here.

**{¶ 120}** Second, Froman contends that the prosecutor improperly asked, "And in fairness, you didn't have an opportunity to interview Kim Thomas to get her side of the story, did you?" This question had an obvious answer and served little purpose other than to embarrass the witness. Nevertheless, the trial court sustained Froman's objection to the question, and Froman has not demonstrated that prejudicial error occurred.

**{¶ 121}** Finally, Froman argues that the prosecutor improperly asked Dr. Schmidtgoessling about the Personal Assessment Inventory ("PAI") and OMNI testing that she had administered to Froman in 2017. That line of questioning included the following:

> Q: These weren't performed back at the time that this situation occurred where he murdered those two people in 2014, right?

34

A:  That's correct.

Q:  And are you aware that at the time that you performed these tests in 2017, Terry Froman had been sitting in jail for over two years facing the death penalty for the murder of two people.  Did you know that?

A:  I did.

The trial court overruled Froman's objection to this line of questioning.

{¶ 122} The prosecutor's two questions about the testing merely clarified that Froman had taken the tests well after the murders occurred, while he was awaiting trial.  The prosecutor committed no misconduct in asking those questions, because they focused the jury's attention on the reliability of the test results.

*2. Arguing the aggravating circumstances*

{¶ 123} Froman argues that the prosecutor committed misconduct by arguing that the crime itself was an aggravating circumstance.  The prosecutor argued:

The second aggravating circumstance that you've already found is that the aggravated murder of Kimberly Thomas was completed while he was committing a kidnapping offense.  And he was the principal offender.  This aggravating circumstance focuses on the kidnapping of Kimberly Thomas.  It focuses on [Froman] removing her from her home after she had just witnessed her son shot execution style in the back of the head.

{¶ 124} The mitigation phase of a capital trial has a specific purpose: the jury must determine "whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors" beyond a reasonable

doubt. R.C. 2929.03(D)(2). "[T]he 'aggravating circumstances' against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (A)(8) that have been alleged in the indictment and proved beyond a reasonable doubt." *State v. Wogenstahl*, 75 Ohio St.3d 344, 662 N.E.2d 311 (1996), paragraph one of the syllabus. The jury shall consider any evidence relevant to those aggravating circumstances, including evidence about their nature and circumstances. R.C. 2929.03(D)(1); *Wogenstahl* at 353.

{¶ 125} The prosecutor may comment on any "testimony or evidence relevant to the nature and circumstances of the aggravating circumstances specified in the indictment of which the defendant was found guilty." *State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253 (1995), syllabus. Here, one of the aggravating circumstances included in the indictment for which Froman was found guilty was that he committed aggravated murder while kidnapping Thomas, R.C. 2929.04(A)(7). We conclude that the prosecutor's argument was focused on the nature and circumstances of the aggravating circumstance and was proper. *See Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, at ¶ 146.

{¶ 126} In any event, Froman cannot show that he was prejudiced by the prosecutor's comment, because the trial court correctly instructed the jury on the aggravating circumstances and the proper standard for the jury to apply in its weighing process. *See Mammone* at ¶ 147. It is presumed that the jury followed the court's instructions. *State v. Loza*, 71 Ohio St.3d 61, 79, 641 N.E.2d 1082 (1994).

*3. Commenting on Froman's unsworn statement*

{¶ 127} Froman argues that the prosecutor committed misconduct during the mitigation-phase closing arguments by referring to Froman's unsworn statement as "self-serving."

{¶ 128} When a defendant chooses to make an unsworn statement during the mitigation phase of a capital trial, the prosecutor "may comment that the defendant's statement has not been made under oath or affirmation, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath in contrast to the testimony of all other witnesses." *State v. DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542 (1988), paragraph two of the syllabus. However, misconduct occurs when a prosecutor "refer[s] not only to credibility but also to [the defendant's] silence on particular issues." *State v. Lorraine*, 66 Ohio St.3d 414, 419, 613 N.E.2d 212 (1993).

{¶ 129} Here, the prosecutor's brief comment on Froman's unsworn statement was directed at the statement's credibility. *See State v. Bedford*, 39 Ohio St.3d 122, 125, 529 N.E.2d 913 (1988). Moreover, the trial court sustained Froman's objection to the prosecutor's comment and instructed the jury to disregard it. Again, the jury is presumed to have followed the court's instructions. *State v. Goff*, 82 Ohio St.3d 123, 135, 694 N.E.2d 916 (1998). In any event, Froman has not shown that he was prejudiced by this statement.

### 4. Referring to Froman as "Tricke"

{¶ 130} Froman argues that the prosecutor disparaged him by referring to him during the trial by his nickname, "Tricke." The prosecutor referred to Froman by the name "Tricke" during witness testimony and throughout opening statements and closing arguments. However, defense counsel never made a contemporaneous objection, so Froman has thus forfeited all but plain error. *See State v. Gillard*, 40 Ohio St.3d 226, 230, 533 N.E.2d 272 (1988).

{¶ 131} It is improper for a prosecutor to use a defendant's nickname for the purpose of impugning the character of the defendant. *Id*. at 230. Froman argues that the prosecutor called him "Tricke" to signal to the jury that he was a "trickster" or a dishonest person. However, "Tricke" was Froman's nickname. The license plate on Froman's vehicle included the license-plate number "TRICKE1," and a

decal on the side of that same vehicle said the word "Tricke." Terry Thomas (Kimberly Thomas's father and Eli's grandfather), Munsell and Melissa Clark (Thomas's co-workers), and Clark (Froman's friend) all testified that "Tricke" was Froman's nickname. Munsell testified that she knew Froman only by the name "Tricke." Also, Thomas had a tattoo on her wrist that said the word "Tricke."

{¶ 132} Nevertheless, the prosecutor's use of Froman's nickname was unnecessary and might have been an attempt to impugn his character. *See State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 261-262. Again, however, the evidence admitted against Froman was overwhelming. Based on that evidence, we cannot conclude that the prosecutor's referring to Froman by his nickname prejudiced the outcome of the trial. Thus, we conclude that no plain error occurred.

{¶ 133} Based on the foregoing, we reject proposition of law No. 5.

### J. Ineffective assistance of counsel

{¶ 134} In proposition of law No. 4, Froman argues that his trial counsel rendered ineffective assistance during both the guilt and the mitigation phases of the trial. In order for this court to reverse Froman's judgment of conviction and sentence, Froman must establish both that his counsel were deficient and that the deficient performance prejudiced his defense so as to deprive him of a fair trial. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.[2]

*1. Defense counsel not licensed in Kentucky*

{¶ 135} Froman argues that his counsel were ineffective because they were not licensed to practice law in Kentucky. He contends that because his counsel did not have licenses to practice law in Kentucky, which is where Eli's death occurred, they could not properly defend him with respect to the circumstances involving Eli's death. Although Froman was not charged with Eli's murder in Ohio, that

---

2. Froman's argument in proposition of law No. 4 that his counsel were ineffective for failing to question juror No. 49 about her racial bias is addressed above in Section III.C.1.

murder was relevant to the course-of-conduct specification attached to Counts 1 and 2 of the indictment.

{¶ 136} During a hearing on Froman's motion to dismiss the course-of-conduct specifications, Froman's defense counsel argued the following:

> One of the things we're concerned about, to say the least, is I'm not licensed or practicing in Kentucky and counsel have to argue a case within a case. * * * I think we get in all kinds of quagmire at this point for the reason that Kentucky law is different from Ohio law. It has to be a purposeful killing in Ohio and you can't apply that to factual situations that occurred in a state outside of our jurisdiction.

The trial court denied Froman's motion to dismiss the course-of-conduct specifications.

{¶ 137} As discussed in our analysis of proposition of law No. 1, Ohio properly exercised jurisdiction over the course-of-conduct specifications relating to Eli's murder. And Ohio law, not Kentucky law, applied to those course-of-conduct specifications. Froman argues that his defense counsel were not familiar with the culpable mental state regarding Eli's murder under Kentucky law and yet had to defend "a case within a case" from Kentucky. But defense counsel did not need a Kentucky law license to defend Froman on the specifications relating to the murder of Eli, because the culpability necessary to find Froman guilty of the specifications was controlled by Ohio law. Accordingly, we conclude that defense counsel did not render deficient performance.

### 2. Conceding guilt

{¶ 138} Froman argues that his defense counsel were ineffective because they conceded his guilt during opening statements.

{¶ 139} Counsel's conceding guilt in a capital case does not necessarily constitute deficient performance. *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 134, citing *Florida v. Nixon*, 534 U.S. 175, 190-191, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). "Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. * * * In such cases, 'avoiding execution [may be] the best and only realistic result possible.' " (Brackets sic.) *Nixon* at 191, quoting American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Section 10.9.1, Commentary (Rev.Ed.2003), reprinted in 31 Hofstra L.Rev. 913, 1040 (2003).

{¶ 140} During opening statements, Froman's defense counsel told the jury the following:

As you're well aware of over the last several days, we are not obviously contesting that [Froman] caused the death of Ms. Thomas. He acknowledged that, he will acknowledge that, and that's what the evidence will show in this matter. The evidence is going to show that he is extremely remorseful. That there's other issues involved that hopefully will come out at trial, not a justification, but a mitigation.

* * *

The evidence is going to clearly show that Mr. Froman is totally responsible for the death, not a justification, but I told you before, the evidence is going to show mitigating factors in this matter.

{¶ 141} Again, Froman's guilt was clear. His counsel knew that evidence would be introduced at trial to establish that Froman had kidnapped Thomas and

had killed Eli at Thomas's home. Video footage showed Froman abducting Thomas at the gas station, Froman admitted to Clark that he had killed Eli and intended to kill Thomas, state troopers heard Froman fire the gunshots that killed Thomas, and forensic evidence linked the found shell casings to Froman's gun. Given the overwhelming evidence of Froman's guilt, it was rational for Froman's defense counsel to concede that Froman had committed the charged offenses and to focus on mitigation.

{¶ 142} Defense counsel's strategic decision to concede Froman's guilt maintained the defense's credibility and allowed defense counsel to focus the jury's attention on Froman's mitigating evidence supporting a life sentence. *See State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 60. The concession reinforced Froman's mitigation-phase strategy emphasizing his remorse and acceptance of responsibility. Furthermore, Froman has not asserted that he objected to his counsel's decision to concede his guilt before opening statements were presented, which would be a prerequisite supporting his argument that reversible error occurred. *See McCoy v. Louisiana*, __ U.S. __, 138 S.Ct. 1500, 1511, 200 L.Ed.2d 821 (2018) (counsel's concession of client's guilt over client's express objection constitutes structural error).

{¶ 143} Froman argues that his defense counsel should have raised alternative defense theories during the guilt phase of the trial, such as Froman's insanity or that he had acted under duress. An insanity defense would have required proof that Froman "did not know, as a result of a severe mental disease or defect, the wrongfulness, of [his] acts." R.C. 2901.01(A)(14). Nothing in the record indicates that an insanity defense could have been persuasively presented. In fact, Dr. Schmidtgoessling testified during the mitigation phase that "[t]here was never evidence from what I saw or the way that he talked to suggest that [Froman] had any major mental disorder like schizophrenia or bipolar disorder."

**{¶ 144}** Froman has also failed to show that defense counsel had a basis to raise the defense of duress. "One of the essential features of * * * a duress defense is the sense of present, imminent, immediate and impending death, or serious bodily injury." *State v. Cross*, 58 Ohio St.2d 482, 487, 391 N.E.2d 319 (1979). There is no evidence in the record showing that Froman faced the threat of death or serious bodily injury when he committed the offenses.

**{¶ 145}** In conclusion, Froman has failed to show that his counsel were deficient by conceding his guilt during opening statements. Moreover, considering the overwhelming evidence of Froman's guilt, he has failed to show that the outcome of his trial would have been different if his counsel had pursued another defense strategy. *See State v. Goodwin*, 84 Ohio St.3d 331, 338, 703 N.E.2d 1251 (1999).

*3. Failure to call mitigation witnesses*

**{¶ 146}** Froman argues that his defense counsel were ineffective by failing to call as a mitigation witness an expert in domestic violence, and Froman's former supervisors, employers, or coworkers.

**{¶ 147}** Defense counsel's decision to call or not call a mitigation witness is a matter of trial strategy. *Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, at ¶ 116. " 'Attorneys need not pursue every conceivable avenue; they are entitled to be selective.' " *State v. Murphy*, 91 Ohio St.3d 516, 542, 747 N.E.2d 765 (2001), quoting *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir.1993).

**{¶ 148}** Froman argues that his defense counsel should have called as a witness a domestic-violence expert to follow up on Dr. Schmidtgoessling's conclusion that "this is really a domestic violence case." Froman contends that an expert witness was needed to explain "how [he] reacted and why he did."

**{¶ 149}** We have never held that defense counsel's failure to present expert-witness testimony during the mitigation phase is per se deficient performance. *See*

*State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 307. Moreover, a defendant cannot establish ineffective assistance of counsel based on counsel's failure to call an expert witness if counsel used "alternative devices" to "fulfill the same functions as the expert assistance sought." *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 145; *see also State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph four of the syllabus.

{¶ 150} The state argues that a domestic-violence expert witness was unnecessary because the purpose of Dr. Schmidtgoessling's testimony was to explain how Froman acted and why he acted that way. We agree. Dr. Schmidtgoessling testified that Froman's sense of loss after breaking up with Thomas and the anger and humiliation that he had experienced after finding out that she had communicated with other men affected his mental state prior to the murders. Accordingly, Froman has failed to show that his counsel were deficient by failing to call a domestic-violence expert witness, because the hypothetical witness's testimony would have covered the same topics that Dr. Schmidtgoessling had covered.

{¶ 151} In any event, Froman has also not shown that he was prejudiced by counsel's allegedly deficient performance. He does not identify any specific evidence that a domestic-violence expert witness might have presented to assist him or explain why such evidence would have prompted the jury to recommend a life sentence. Thus, this ineffective-assistance claim lacks merit.

{¶ 152} Froman also argues that his counsel were ineffective by failing to call as witnesses Froman's former employers, supervisors, or coworkers to testify about his "mental limitations, if they knew," and his good work habits. But Dr. Schmidttgoessling testified about both of those topics. And Froman's daughter, Alexis, also testified that her father had been a hard worker and a good provider. Froman does not specify what information his former employers, supervisors, or coworkers might have added if they had testified.

{¶ 153} We conclude that defense counsel's decision not to call Froman's former employers, supervisors, or coworkers as additional mitigation witnesses was a "tactical choice," *see State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 241, and did not amount to ineffective assistance of counsel.

{¶ 154} Based on the foregoing, we reject proposition of law No. 4.

### K. Cumulative error

{¶ 155} In proposition of law No. 12, Froman argues that cumulative errors during both phases of the trial deprived him of a fair trial and a reliable sentencing hearing.

{¶ 156} Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. But this claim lacks merit because Froman has not shown that he was prejudiced by any error during his trial. And even if the errors that occurred during Froman's trial are cumulated, the combined effect of those nonprejudicial errors did not deprive Froman of a fair trial.

{¶ 157} Based on the foregoing, we reject proposition of law No. 12.

### L. Constitutionality of capital sentencing

{¶ 158} In proposition of law No. 13, Froman argues that Ohio's capital-sentencing procedures violated his Sixth Amendment right to a jury trial as construed in *Hurst v. Florida*, ___ U.S. ___, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016). We reject this argument on the authority of our decision in *State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, 108 N.E.3d 56, ¶ 43, in which we rejected the same argument.

{¶ 159} In proposition of law No. 14, Froman challenges the constitutionality of Ohio's death-penalty statutes and claims that they violate international law and treaties to which the United States is a party. We have

previously rejected these same arguments, and we do so again here. *See, e.g.*, *Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, at ¶ 279-280.

### M. Appropriateness of the death sentence

{¶ 160} In proposition of law No. 11, Froman argues that the death sentence is not an appropriate sentence for him because of his personal history, his background, his below-average IQ, his mental state at the time of the offenses, the love and support for him shown by his daughter, and his acceptance of responsibility and remorse for causing the deaths of Thomas and Eli. We shall consider these arguments below in our independent evaluation of Froman's death sentence.

### IV. INDEPENDENT SENTENCE EVALUATION

{¶ 161} Having considered Froman's propositions of law, we must now independently review Froman's death sentence for appropriateness and proportionality as required by R.C. 2929.05(A).

{¶ 162} Before the start of the mitigation phase, the findings of guilt for Froman's two aggravated-murder counts were merged. The state elected to proceed with sentencing on Count One 1 (aggravated murder with prior calculation and design).

### A. Aggravating circumstances

{¶ 163} Froman was convicted of two death-penalty specifications on Count 1: (1) committing aggravated murder as part of a course of conduct involving the purposeful killing of two or more persons (Thomas and Eli), R.C. 2929.04(A)(5), and (2) committing aggravated murder while committing a kidnapping, R.C. 2929.04(A)(7). The evidence presented at trial and described herein supports the jury's findings as to both of these aggravating circumstances.

**B. Mitigating evidence presented**

{¶ 164} We must weigh the mitigating factors contained in R.C. 2929.04(B) against the aggravating circumstances. Froman called two mitigation witnesses and made an unsworn statement during the mitigation phase.

*1. Alexis Froman's testimony*

{¶ 165} Alexis Froman, the defendant's 16-year-old daughter, testified that she had a good relationship with her father while growing up. He had always been in her life, and they had a normal father-daughter relationship. Alexis had visited her father in the Warren County jail and they exchanged letters. Since Froman had been confined, Alexis experienced several mental disorders, including major depressive disorder and posttraumatic-stress disorder. She had been hospitalized twice for those conditions. Froman had helped her to cope with her depression by telling her that "he loves [her] and to stay strong."

{¶ 166} In discussing Froman's life, Alexis stated that her father had always worked and provided for his family. However, he lost his job shortly before the murders in this case occurred in September 2014. Alexis testified that after Froman had lost his job, his behavior changed and he became "more distant." Froman had experienced financial problems and he slept in his vehicle and took showers at his cousin's and aunt's homes.

{¶ 167} Alexis testified that her father had expressed remorse for the murders "numerous times." She emphasized that Froman is a good father and that she would remain in his life if he were to receive a life sentence. Alexis asked the jury not to sentence her father to death because she still needs him for his motivation and encouragement.

*2. Unsworn statement*

{¶ 168} In an unsworn statement, Froman told the court that he accepted total responsibility for what had happened. Froman also discussed his life and explained the events leading up to the murders, stating:

Kim Thomas and I were together for almost four years. I loved her. * * * When we first got together she treated me good. I thought she loved me. Later she changed how I was treated. She was not nice to me. She ordered me around. When she needed money I gave her $8,900 and $100. She wouldn't give any of it back, even when I had no work. I was very depressed and went back and forth with trying to be happy and I wanted to kill myself.

I was sick from sugar diabetes and hypertension. I had severe headaches. * * * She made me sleep on the couch. And she would make me walk behind her when we were in public. I saw her phone and I saw that she had sent naked pictures of herself to different men and women. I knew she was having sex with other men.

{¶ 169} Froman emphasized his wrongdoing and expressed his remorse, stating, "Every day—I have been in jail since September 2014, I have prayed and regretted what I did. No matter what was going on in my life, what I did was horrible." He also stated, "I will never forget the damage I have caused [to] so many people. No one can justify what I did. I am truly sorry." Regarding the day of the murders, Froman said, "When I went to her house, I just wanted to be with her. I loved Eli, he was a good person. * * * The rest of the day different thoughts have jumped into my head. I was upset, angry, and didn't know what to do."

{¶ 170} Froman said that Thomas had given him a birthday card on July 9, 2014. He said that she wrote, "Things can't always be perfect, but even on a bad day I know that I love you with all my heart. I know I have caused you pain and mistrust, but I pray every day that you will forgive me and know that my love for

you is real, and I intend to make you happy for the rest of our lives together." Froman stated that he thought "she was changing, but things did not change."

{¶ 171} In conclusion, Froman told the jury the following:

> I have tried to plead guilty to life imprisonment and to die in prison. The prosecutor told my attorney that they would not agree to that. * * * I do not want to die because my mother and daughter want me to live. My mother is not well, she * * * wants me to continue to be a part of her life. And she told me she would write me and visit me when she could.
>
> * * *
>
> My daughter has had mental health problems. She wants me to be alive and continue to be in her life. * * * I am the only one that caused me to be in this situation, but I am worried about my daughter. I want to live. And very sorry for what I have done. Thank you. May God forgive me.

*3. Psychologist's testimony*

{¶ 172} Dr. Schmidtgoessling testified that Froman had been born and raised in Paducah, Kentucky. He was raised by his mother along with his four sisters and one brother. Froman felt that his mother had been overly strict and said that she had hit him and called him names. His father "really wasn't that available." Froman completed high school, but he was "[n]ot the best student."

{¶ 173} Dr. Schmidtgoessling testified that Froman had taken the Wechsler Adult Intelligence Scale test and that his full-scale IQ was 86, which is in the low-average range. Froman's Perceptual Reasoning Index score was 104, which is in the average range. His Working Memory Index score was 100, which is in the average range, and his Processing Speed Index score was 81, which is in the low-

average range. Dr. Schmidtgoessling testified that Froman was "certainly capable of managing his life."

{¶ 174} Dr. Schmidtgoessling also administered to Froman the PAI test, which surveys a wide variety of psychological disorders and symptoms, and the OMNI test, which measures personality traits. Dr. Schmidtgoessling testified that Froman's PAI results suggested that he has symptoms of depression, particularly in how he looks at the world, and that his OMNI test results showed that Froman tends to be an unhappy, pessimistic person who "sees the cloud rather than the silver lining."

{¶ 175} Dr. Schmidtgoessling diagnosed Froman with major depression. But she testified that he "did not appear to have a severe mental health disorder like schizophrenia or schizoaffective disorder or bipolar disorder." She stated that Froman "come[s] across as dejected and kind of morose." But Froman did not show signs of having bizarre thoughts, and his thoughts were always organized and realistic.

{¶ 176} Dr. Schmidtgoessling testified that Froman had reported to her that he had many jobs in the past. He had worked for around ten years in the restaurant industry and had assisted with opening stores in Kentucky and Tennessee. According to Dr. Schmidtgoessling, Froman had "had positions of responsibility that required decision making and some amount of judgment about people, potential employees. So in many respects he functioned better than you might have expected for a person of an IQ of 86."

{¶ 177} Froman reported to Dr. Schmidtgoessling that he and Thomas had been together for approximately four years. He described their relationship as "very, very special" to him, and he "loved her more than anything." They had even talked about marriage and of having a child together.

{¶ 178} Froman told Dr. Schmidtgoessling that as time had gone on, he began to believe that Thomas was seeing other people. He said that he had looked

at her phone and found evidence that she was communicating with other people about sexual matters. He said that finding those communications had been a huge turning point in their relationship and that their relationship deteriorated from that point forward. Froman said that Thomas had wanted him to sleep on the couch and that she did not want to be intimate with him any longer. Froman also said that he had loaned Thomas about $9,000 and that she could not repay it or account for how it had been spent.

{¶ 179} Dr. Schmidtgoessling testified regarding the trust issues and stress Froman had experienced before the murders, stating, "One was the loss of their relationship because he felt this woman was really special. The second one is that he is a worker, that's real important to his identity. He had not been working I think for a month or so * * * prior to this offense." She concluded by testifying that "when you evaluate people with domestic violence, this is really a domestic violence case. I understand the person died horribly. * * * The intertwinement of the relationship with his mental state is so powerful and unfortunately we see this. This type of offense is not that uncommon, sadly."

### C. Independent weighing and proportionality

{¶ 180} Nothing in the nature and circumstances of the offenses is mitigating. Froman, then 41 years old, murdered Eli and then kidnapped Thomas. Froman then fled to Ohio and murdered Thomas after being stopped by the OSHP.

{¶ 181} The statutory mitigating factors under R.C. 2929.04(B) include R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal record), (B)(6) (accomplice only), and (B)(7) (any other relevant factors). Having reviewed the evidence and considered these statutory factors, we find that none of the statutory factors apply except the catch-all provision of R.C. 2929.04(B)(7).

**{¶ 182}** Froman urges this court to give weight to the fact that he "was moody, lethargic, and suffered from depression" at the time of the offenses. Dr. Schmidtgoessling testified that Froman did not have any severe mental-health disorders, although he did have major depression. However, there is no evidence in the record indicating that Froman's depression rose to the level of the type of mitigating "mental disease or defect" referred to in R.C. 2929.04(B)(3) ("Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of the law"). Evidence of his depression is, however, relevant under R.C. 2929.04(B)(7), which allows this court to consider as mitigating "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death." *See also State v. Treesh*, 90 Ohio St.3d 460, 492, 739 N.E.2d 749 (2001) (considering evidence of a mental disorder when the disorder did not satisfy the criteria of R.C. 2929.04(B)(3)). Accordingly, we give some weight to the evidence of Froman's depression.

**{¶ 183}** We also give some weight to Froman's low-average IQ of 86 as a factor under R.C. 2929.04(B)(7). *See State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 264 (IQ of 82 entitled to weight in mitigation); *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 146 (IQ of 83 given considerable weight). However, there was no evidence presented establishing a significant connection between Froman's low IQ and the murders he committed. *See Drummond* at ¶ 264.

**{¶ 184}** Froman's expressions of remorse and his acceptance of responsibility for his offenses are entitled to some weight under R.C. 2929.04(B)(7). *See Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, at ¶ 185. We also give weight to Alexis's testimony that Froman loves and supports her and to the evidence showing that Froman had been consistently

employed and was a hard worker. *See State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 327.

{¶ 185} However, the two death-penalty specifications that apply here—the course-of-conduct specification and the kidnapping specification—overwhelm the mitigating factors in this case. Thus, we conclude that the aggravating circumstances clearly outweigh the mitigating factors beyond a reasonable doubt.

{¶ 186} As a final matter, we conclude that the death sentence imposed in this case is appropriate and proportionate to death sentences that we have upheld in similar cases. We have previously upheld death sentences involving a course-of-conduct specification under R.C. 2929.04(A)(5). *See, e.g.*, *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 182; *Trimble* at ¶ 329. We have also upheld death sentences as punishment for aggravated murder committed during the course of a kidnapping under R.C. 2929.04(A)(7). *See, e.g.*, *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 169; *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 334; *Trimble* at ¶ 331.

## V. CONCLUSION

{¶ 187} For the foregoing reasons, we affirm Froman's judgment of conviction and death sentence.

Judgment affirmed.

KENNEDY, FRENCH, FISCHER, DEWINE, DONNELLY, and STEWART, JJ., concur.

———————————

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Timothy J. McKenna and Roger W. Kirk, for appellant.

Jeffrey M. Gamso and Noelle A. Powell, urging reversal for amicus curiae, Ohio Association of Criminal Defense Lawyers.

January Term, 2020

_____