[Cite as *State v. Thornton*, 2022-Ohio-3452.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-210629 |
| | | C-210630 |
| Plaintiff-Appellee, | : | C-210631 |
| | | C-210632 |
| vs. | : | TRIAL NOS. 21CRB-11736-A |
| | | 21CRB-11736-B |
| QUINNETTA THORNTON, | : | 21CRB-11737-A |
| | | 21CRB-11737-B |
| Defendant-Appellant. | : | |
| | : | *O P I N I O N.* |

Criminal Appeals From: Hamilton County Municipal Court

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: September 30, 2022

*Andrew W. Garth*, City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Ashton Tucker*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Lora Peters*, Assistant Public Defender, for Defendant-Appellant.

**Bock, Judge.**

**{¶1}** Defendant-appellant Quinnetta[1] Thornton appeals her convictions of four counts of domestic violence. For the reasons stated herein, we affirm the trial court's judgments.

## I.  Facts and Procedure

**{¶2}** In July 2021, Thornton was charged with four counts of domestic violence in violation of R.C. 2929.159(A)(1), misdemeanors of the first degree. Thornton was accused of committing domestic violence against her four minor children, ages ten, eight, six, and five.

**{¶3}** At an August 2021 jury-trial setting, the state asked for a continuance because it had discovered new evidence and one of its witnesses was not present. Thornton objected, stating that she was ready for trial and she was unable to see her children due to the temporary protection order that resulted from the domestic-violence charges. The trial court granted the continuance.

**{¶4}** At a September 2021 jury-trial setting, the state requested another continuance because it needed to resolve evidentiary issues. Thornton objected, arguing that she had not seen her children in three months and was ready for trial. The court granted the continuance.

**{¶5}** The trial court held a bench trial in October 2021.

### A neighbor heard screaming

**{¶6}** Angelo Bart testified that his home is about 40 feet from Thornton's. He heard "multiple kids, screaming pleading to stop. It sounded like they were getting

---

[1] A review of Thornton's court history revealed that her first name has been spelled "Quinnettea," and, as reflected in the underlying trial documents, "Quinnetta." We use the latter spelling.

hit." Bart testified that it "seemed like the children were being hit and they were just yelling to stop." While he initially thought that it was "a minor discipline," he became concerned, so he accessed his security camera to hear better. He listened for about five minutes before deciding that the situation was "getting out of hand" because the "kids were pleading," so he called 911. The police arrived about ten minutes later.

{¶7} Seventeen minutes of Bart's security footage was played during trial. Bart testified that the audio from the footage sounded like the children were being hit and Thornton repeatedly said, "turn around" and "I don't want to hurt you."

### A police officer witnessed screaming and Thornton hitting a child with a belt

{¶8} Cincinnati Police Officer Tim Pappas responded to the Thornton home, along with Officers Steve Bosse and Michele Carter. Pappas testified that they parked about 100 feet away from the Thornton home and, as they walked up the sidewalk, he heard "a lot of commotion" and what sounded "like a child screaming along with an adult" and that it "sounded fairly horrific * * * like such chaos." A screened window and its blinds were open, which allowed Pappas to see inside.

{¶9} Pappas testified that he heard what sounded like "a child was being severely beaten." He could see Thornton but could not see the full body of who she was hitting. Pappas determined that the child was being beaten after "ten or fifteen seconds" of hearing a child screaming and the belt snapping. Pappas testified that after he saw Thornton hit the child with the belt, he "punched [his] hand through the screen and [he] tried to grab a hold of" Thornton, telling her to stop.

{¶10} Pappas's body-worn camera ("BWC") footage was played during trial. While the video did not show what Pappas had seen due to the position of the camera on Pappas's chest, he could be heard on the video saying "put [the belt] down." Pappas

3

testified that Thornton was using a belt to strike one of the children, who was naked, "cowering down," and crying in a corner of the room.

{¶11}  Pappas placed Thornton in custody. The officer discovered that three other children were also in the home, naked. 241-KIDS responded to the scene as the officers began to take pictures.

{¶12}  Pappas testified that the children were "visibly upset and several of them had welts about different parts of their body." According to Pappas, Thornton became "very belligerent and very out of control for a small amount of time," which caused the responders to request that Thornton be removed from the home or they would take the children to another location to be examined.

<u>Police, EMT, and caseworker witness welts on the children</u>

{¶13}  Cincinnati Police Sergeant Jennifer Dawson testified that she took photographs of Thorton's four children—all had injuries on their bodies. The ten-year-old child, M.S., had welts that were "red," "fresh," and four-to-six-inches long on various parts of her body. Eight-year-old M.S. had two welts on his left leg that were "fresh" and "red," and a two-to-three-inch red mark on both his right knee and left arm. Five-year-old K.J. had a "fresh red" welt on her arm. And four-year-old Q.J. had multiple "red" and "swollen" welts over "pretty much the whole back thigh."

{¶14}  Cincinnati Police Officer Michele Carter testified that when she arrived, three of the children were naked. She spoke with the oldest child briefly. She saw welts on the bodies of the children. Thornton was "partially clothed." Carter testified that Thornton told her that she was disciplining the children because they did not do as they were told. Carter testified that the belt Thornton used to strike the children had "no actual buckle" but "a metal piece with a screw sticking out."

{¶15} Jena Samelak, a firefighter emergency medical technician, responded to a call for domestic violence at the Thornton home. Samelak evaluated the children for injuries. She testified that the injuries on the oldest child looked worse in person than in the photographs because she remembered that the welts were raised. Samelak saw multiple welts on each child. She testified that K.J. had told her that Thornton had hurt her. She stated that the boy had the least amount of marks on him—he had two raised welts.

{¶16} Joy Swing, a 241-KIDS caseworker, responded to the scene. Swing testified that the oldest child explained what had happened that evening and showed Swing her injuries, which Swing determined were caused by a belt. Swing testified that the photographs of the children did not depict the severity of the welts. Swing stated that the youngest child had the most injuries, having five to six welts.

Thornton testified in her own defense

{¶17} Thornton was a foster child who was abused as a child. Adults beat her and starved her for not following directions. Thornton testified that the difference between discipline and a beating is "like when we got a whooping, it was everyone got a whooping together like for not cleaning up or * * * being disrespectful. And the beatings was just because." She further testified that a "whooping" is done with items like a belt, extension cords, or switches. She said that her foster parents also used a piece of wood from a rocking chair, but never got into trouble for these methods. Thornton testified that she is a single mother of the four children, has no help from family, and the children have no father figure.

{¶18} Thornton testified that she had instructed the children to clean up the house, which was hot because the air conditioning was not working. She stated that

the children were not cleaning as they were told, so she began to yell and took away certain items, then she went back into her bedroom. She heard the two youngest fighting, so she came out of her room yelling and "probably was using profanity." She realized that the living room couch was wet and there was water on the floor. The children were not cleaning up the "stuff" that was "everywhere," so she said that everyone was "about to get a whooping." Thornton testified that she does not usually resort to "whoopings."

{¶19} Thornton testified that she got a belt and told the children to "drop their pants" because "that is how [she knows] how to give a whooping." She stated that she had tried "time out" and taking items, but the children did not listen to her. Thornton testified that the oldest child was "doing too much" by grabbing a blanket and sitting in a corner. Thornton made the boy lay across the bed as she "whacked" his bottom, but every time she hit him with the belt, he moved or he would grab it, causing her to hit herself. Thornton stated that she intended to strike the children on their bottoms because that is how she gives "whoopings." Thornton testified that the audio where the children were heard screaming was from the children "grabbing stuff, running around the room."

{¶20} On cross-examination, Thornton reiterated that a "whooping" consists of being struck on the buttocks, and the marks found on the children's bodies outside of their buttocks were caused by the children squirming during the "whooping" as she "never intended" to hit elsewhere. She stated that she did not hit the youngest child and if she was injured, it was because she was standing too close to where the other children were being struck. She testified that she did not tell the children to strip naked, but only to take off their bottoms. The girls, according to Thornton, were naked

because they all were wearing dresses. Thornton conceded that she struck the children with the belt but reiterated that it was "[o]nly on their behinds though."

### Trial court's judgment

**{¶21}** The trial court found Thornton guilty on all four counts. The trial court scheduled a sentencing hearing and ordered a presentence investigation ("PSI").

**{¶22}** The trial court held a sentencing hearing in November 2021. As the children were young, the PSI included a victim-impact statement consisting of statements from the Hamilton County Department of Job and Family Services ("JFS") and the arresting officer. JFS asked the court to allow Thornton to visit her children.

**{¶23}** The court imposed a 180-day sentence on each count with credit for one day and suspended the remaining 179 days, and one-year of community control to be served to completion as the court wanted to be able to monitor Thornton. The court recommended that Thornton participate in counseling and, in stating that it wanted to comply with JFS's safety plan, lifted the TPO.

## II.  Law and Analysis

### A.  Granting continuances lies within the trial court's discretion

**{¶24}** Thornton's first assignment of error asserts that the trial court abused its discretion by granting "numerous" motions for continuances.

**{¶25}** Trial courts considering a motion for a continuance should balance all competing considerations, including potential prejudice to the defendant and the court's right to control its own docket. *In re K/S*, 1st Dist. Hamilton No. C-200235, 2020-Ohio-4808, ¶ 27. The decision to grant or deny a continuance rests in the broad discretion of the trial court. *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, ¶ 91. An appellate court should not interfere with a trial court's

decision to grant a continuance absent an abuse of discretion. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 57. A court abuses its discretion when its decision is unreasonable, arbitrary, or unconscionable. *State v. Shelton*, 1st Dist. Hamilton No. C-170547, 2018-Ohio-3895, ¶ 22.

{¶26} In evaluating a motion for a continuance, a court should consider (1) the length of the delay requested; (2) whether other continuances have been requested and received; (3) the inconvenience to litigants, witnesses, opposing counsel and the court; (4) whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; (5) whether the defendant contributed to the circumstance giving rise to the request for a continuance; and (6) other relevant factors, depending on the unique facts of each case. *Crown Asset Mgt., LLC v. Gaynor*, 1st Dist. Hamilton No. C-210157, 2022-Ohio-1468, ¶ 19.

{¶27} Thornton's first assignment of error characterizes the continuances granted as "numerous." But the trial court granted only three continuances. None of the three constituted an abuse of discretion. The first continuance was due to the judge being unavailable. The other two were sought for unresolved evidentiary issues, and Thornton was concerned about the same evidentiary issues. The delays were not lengthy. Though Thornton surely was inconvenienced because she was denied the right to see her children, the continuances were sought for legitimate reasons. The trial court's granting of the continuances ensured that both parties were adequately prepared for trial.

{¶28} The trial court did not abuse its discretion in granting the continuances. Thornton's first assignment of error is overruled.

B.  Thornton's convictions were not contrary to the
manifest weight of the evidence

**{¶29}** Thornton's second assignment of error asserts that her convictions were not supported by the manifest weight of the evidence.

**{¶30}** Thornton was convicted of four counts of domestic violence under R.C. 2919.25(A) for striking her children with a belt and leaving visible welts on them. R.C. 2919.25(A) provides, "No person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2901.01(A(3) defines "physical harm" as any injury, regardless of its gravity or duration. The slightest injury is sufficient to prove physical harm. *State v. Daniels*, 2018-Ohio-1701, 111 N.E.3d 708, ¶ 35 (1st Dist.).

<u>"Reasonable parental discipline"</u>

**{¶31}** Reasonable parental discipline is an affirmative defense to a domestic-violence charge. R.C. 2901.05(D)(1)(b); *State v. Faggs*, 159 Ohio St.3d 420, 2020-Ohio-523, 151 N.E.3d 593, ¶ 20-24. Thornton carried the burden to show that her use of physical discipline was reasonable under the circumstances. *Faggs* at ¶ 20-24; R.C. 2901.05(A).

**{¶32}** While generally, a parent may determine how to discipline her child, parents may not cause "physical harm," which is defined by R.C. 2901.01(A)(3) as "any injury * * * regardless of its gravity or duration." *State v. Suchomski*, 58 Ohio St.3d 74, 75, 567 N.E.2d 1304 (1991). This court has defined injury as "the invasion of any legally protected interest of another." *State v. Adaranijo*, 153 Ohio App.3d 266, 2003-Ohio-3822, 792 N.E.2d 1138, ¶ 12 (1st Dist.). Parental discipline becomes domestic violence when the act creates substantial pain, serious injury, or a risk of death. *Id.*

**{¶33}** Ohio courts have upheld domestic-violence convictions when a parent's discipline left visible marks. The Eighth District upheld a parent's conviction for spanking her 11-year-old son with a belt, leaving welts and bruising on the child's legs

9

and torso that were visible the following day. *State v. Jones*, 140 Ohio App.3d 422, 429, 747 N.E.2d 891 (8th Dist.2000). The Fifth District upheld a conviction in a similar case where a father struck his four-year-old daughter several times on the buttocks with a belt to discipline her for crying, screaming, and refusing to go to bed, leaving bruises on the child's buttocks and legs. *State v. Cantwell*, 5th Dist. Licking No. 2007 CA 00062, 2008-Ohio-3928.

Standard of Review

**{¶34}** When evaluating a parent's claim that a domestic-violence conviction is against the weight of the evidence, we must consider whether the defendant sustained her burden to affirmatively prove that she used only proper and reasonable parental discipline. *State v. Ford*, 8th Dist. Cuyahoga No. 109087, 2020-Ohio-4298, ¶ 27. "Proper" is defined as "suitable or appropriate" and "reasonable" means "not extreme or excessive." *Id.*, quoting *State v. Hauenstein*, 121 Ohio App.3d 511, 516, 700 N.E.2d 378 (3d Dist.1997).

**{¶35}** The reasonableness of corporal punishment in each case must be evaluated in light of all the relevant facts and circumstances, including "the child's age, the child's behavior that led to the parent's action, the child's response to non-corporal punishment, and the location and severity of the punishment," as well as "the parent's state of mind while administering the discipline." *Ford* at ¶ 28, quoting *Jones* at 429.

**{¶36}** In reviewing a weight-of-the-evidence claim, this court must review "the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage

of justice that the conviction must be reversed and a new trial ordered." *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶ 59, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

**{¶37}** The weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *Bailey* at ¶ 63. In reviewing a challenge to the weight of the evidence, this court sits as a "thirteenth juror." *State v. Curry*, 1st Dist. Hamilton No. C-180493, 2020 Ohio App. LEXIS 1184 (Mar. 31, 2020), quoting *Thompkins* at 387. This court will not substitute its judgment for that of the trier of fact on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict. *Bailey* at ¶ 63.

<u>Thornton's acts were unreasonable</u>

**{¶38}** Thornton never denied that she struck the children or that she used a belt to hit them. She admitted that she made them bare their buttocks before she struck them with the belt. The children's screams and the belt snapping can clearly be heard on the audio played in court. Being that Pappas's BWC picked up the sounds of the children screaming and Thornton yelling from about 100 yards away, it is clear that the screams were related to pain, rather than an innocent explanation.

**{¶39}** Bart, the neighbor, had become so concerned with the sounds of children screaming that he activated his security cameras to better hear what was going on. Bart heard the cries of children and what he determined to be the sound of the children being struck with something.

**{¶40}** Officer Pappas observed the oldest child naked and "cowering" in a corner as her mother struck her with the belt. He was concerned enough that he punched through the screen to attempt to grab the belt or otherwise stop Thornton

from striking her child again. Two witnesses, who were separated during their testimony, testified that the welts looked much worse in person than in the photographs. The testimony showed that the welts were fresh, red, and raised. All four of the children had visible welts on their bodies—the youngest child sustained the most injuries. Yet still, Thornton testified that she did not believe she did anything wrong.

{¶41} Like the parents in *Jones* and *Cantwell*, Thornton's acts caused visible marks on the children. The four children suffered "any injury * * * regardless of its gravity or duration" because the welts, screams, and eyewitness testimony showed that Thornton's acts clearly created substantial pain.

{¶42} Thornton's convictions were not against the manifest weight of the evidence. Her second assignment of error is overruled.

### III. <u>Conclusion</u>

{¶43} The trial court properly exercised its discretion in granting the state's requests for the two continuances to address evidentiary issues. Thornton did not meet her burden to prove the affirmative defense of reasonable parental discipline. Therefore, the trial court did not err in convicting Thornton on all four counts. The judgments of the trial court are affirmed.

Judgments affirmed.

**ZAYAS, P.J.,** and **BERGERON, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.