[Cite as *State v. Glass*, 2024-Ohio-4535.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

STATE OF OHIO,

                                CASE NO. 1-23-55

    PLAINTIFF-APPELLEE,

  v.

ROBERT F. GLASS,                        O P I N I O N

    DEFENDANT-APPELLANT.

---

**Appeal from Allen County Common Pleas Court**
**Trial Court No. CR 2023 0092**

**Judgment Reversed and Cause Remanded**

**Date of Decision:  September 16, 2024**

---

APPEARANCES:

    *Russell Patterson* **for Appellant**

    *John R. Willamowski, Jr.* **for Appellee**

**WALDICK, J.**

{¶1} Defendant-appellant, Robert F. Glass ("Glass"), appeals the judgment of conviction and sentence entered against him in the Allen County Common Pleas Court, following a jury trial in which Glass was found guilty of multiple felony charges and specifications. For the reasons set forth below, we reverse.

*Procedural History*

{¶2} This case originated on March 16, 2023, when the Allen County Grand Jury returned a 4-count indictment charging Glass as follows: Count 1 – Aggravated Possession of Drugs (Methamphetamine), a fifth-degree felony in violation of R.C. 2925.11(A) and (C)(1)(a), with a forfeiture specification pursuant to R.C. 2941.1417 relating to U.S. currency; Count 2 – Aggravated Possession of Drugs (Methamphetamine), a second-degree felony in violation of R.C. 2925.11(A) and (C)(1)(c), with a firearm specification pursuant to R.C. 2941.141, and with forfeiture specifications pursuant to R.C. 2941.1417 relating to a firearm and U.S. currency; Count 3 – Having Weapons While Under Disability, a third-degree felony in violation of R.C. 2923.13(A)(2), with a forfeiture specification pursuant to R.C. 2941.1417 relating to a firearm; and Count 4 – Having Weapons While Under Disability, a third-degree felony in violation of R.C. 2923.13(A)(3), with a forfeiture specification pursuant to R.C. 2941.1417 relating to a firearm.

{¶3} On March 24, 2023, Glass filed a written plea of not guilty to all counts in the indictment. Over four months of pretrial proceedings then ensued.

{¶4} On August 1, 2023, a jury trial began in the case. After a jury was selected and sworn, but prior to opening statements, the prosecution moved to dismiss Count 4 of the indictment, a request that was granted by the trial court. The State of Ohio then began presenting its case, which was concluded on August 2, 2023. No witnesses were called by the defense. Following closing arguments of counsel and instructions of law by the trial court, the jury received the case for deliberation at 1:08 p.m. on August 2, 2023. At 4:55 p.m. on that same date, the jury returned verdicts finding Glass guilty on the charges and specifications contained in Counts 1, 2, and 3 of the indictment.

{¶5} The trial court accepted the verdicts and discharged the jury. A sentencing hearing was then held. Glass was sentenced to 12 months in prison on Count 1; to a minimum prison term of 6 years and a potential maximum prison term of 9 years on Count 2, plus an additional and consecutive one-year prison term for the firearm specification; and to 36 months in prison on Count 3. The trial court ordered the sentences on Count 1 and Count 3 to be served concurrently, but ordered the sentences on Counts 1 and 3 to be served consecutively to the prison terms imposed on Count 2. The trial court further ordered that the sentence in this case be served consecutively to the sentence Glass had been ordered to serve in a prior case.

{¶6} On August 17, 2023, Glass filed the instant appeal.

*Relevant Facts*

**{¶7}** On August 1, 2023, the trial proceedings began with the trial judge introducing himself to the prospective jurors, telling them they had been summonsed for a jury trial in a criminal case, and explaining that a jury selection process would be conducted. The judge explained to the prospective jurors that they would be asked questions in order to determine if they were able to be fair and impartial jurors in the case. After touching upon a few other preliminary issues, the trial court asked counsel to introduce themselves and the persons with them. On behalf of the State of Ohio, the Assistant Allen County Prosecutor handling the case introduced himself to the prospective jurors, and noted that seated next to him at counsel table was Investigator Aaron Montgomery of the West Central Ohio Crime Task Force. Defense counsel then introduced himself, as well as the defendant and a legal intern, who were seated with counsel.

**{¶8}** After that, the venire was sworn and the trial court conducted an initial voir dire of the prospective jurors. During that process, the court inquired whether any of the prospective jurors knew counsel for the parties, the defendant, or anyone employed by the law enforcement agencies involved in the case, and the following exchange took place:

> THE COURT: Now, we've got the Prosecutor's Office, the State of Ohio, the Police Department, the Drug Task Force, and we've got Mr. Creighton, and we've got Mr. Glass. Does anybody know anybody in those agencies, or in those offices, or anybody involved? Now, the

parties can let you know who the witnesses are and if that's an issue. So, is it Mrs. Montgomery?

PROSPECTIVE JUROR: Yes.

THE COURT: Do you know Aaron?

[MRS. MONTGOMERY]: Yes.

THE COURT: Are you related?

[MRS. MONTGOMERY]: Yes.

THE COURT: All right. How are you related?

[MRS. MONTGOMERY]: He's my son.

THE COURT: Oh. Okay. Well, that's different than when my mom was on because I was sitting up here and I wasn't sitting down there. Just tell me – do you think you can be fair and impartial to both sides?

[MRS. MONTGOMERY]: Yes, I can.

THE COURT: Even if your son is a representative of law enforcement?

[MRS. MONTGOMERY]: Yes.

THE COURT: Even if he testifies?

[MRS. MONTGOMERY]: Yes.

THE COURT: And you can listen to other witnesses and if they say something different than what your son said, well, are you going to have the tendency to just believe him because he's your son?

[MRS. MONTGOMERY]: No.

THE COURT: Will you listen to both sides and figure out –

[MRS. MONTGOMERY]: No, I can be fair and impartial.

THE COURT: You kind of laughed there. So, maybe – well, are you going to disbelieve everything –

[MRS. MONTGOMERY]: Well, he was a teenager at one time, and not always an adult.

THE COURT: Well, that's a good point. When you know somebody it's easy to decide whether they're telling the truth or not. When you don't know somebody it's a little different process. But, we all have that. When we confront people that are total strangers and they say something we have this mechanism for deciding whether they're telling us the truth or not, especially if it's something that's important. This is very important. You have to decide this like it's important in your own personal affairs. The rules that we use for judging credibility apply to everybody. You think you can do that?

[MRS. MONTGOMERY]: Yes.

THE COURT: Okay. Don't be surprised if they have more questions for you.

[MRS. MONTGOMERY]: Oh, I'm ready. That's fine.

(Tr., 24-26).

{¶9} After the trial court finished its voir dire on various issues, counsel for the parties were permitted to question the prospective jurors constituting the initial panel of twelve, which included Mrs. Montgomery. Neither counsel for the prosecution nor defense counsel asked any additional questions of Mrs. Montgomery relating to her ability to be a fair and impartial juror with regard to the fact that her son was seated at counsel table as the prosecution's law enforcement courtroom representative and would be a witness in the trial, although defense counsel did ask several questions of Mrs. Montgomery relating to her prior employment as a teacher.

{¶10} Following the conclusion of voir dire by counsel, no challenges for cause to any of the prospective jurors in the initial panel of twelve jurors were raised by the prosecution or the defense. The prosecution and the defense then each exercised one peremptory challenge and, following voir dire of the next prospective jurors and the excusal of one of them for cause, a jury of twelve was sworn and seated, which included Mrs. Montgomery. Two alternate jurors were then also chosen.

{¶11} After a recess for lunch, the trial court and counsel discussed a few legal and procedural issues on the record, outside the presence of the jury. Following that, the trial court asked counsel if there was anything else to be discussed, in response to which the following exchange took place:

> MR. CARP [the prosecutor]: Yes, one more thing, your Honor. Your Honor, just following jury selection I know it's no surprise that at this point the jury has been seated. As part of that jury, well, one of the jurors, specifically juror, I believe, number ten, Mrs. Montgomery, is, in fact, related to Investigator Aaron Montgomery. So, I just want to be clear for the record, Judge, you know, whether there's any, I guess, any cause to remove Mrs. Montgomery. The defense did not raise that. I'm sure Mr. Creighton has some sort of strategy, trial strategy, related to who he likes to keep on the jury versus take off the jury. But, I just want the record to be clear that there was nothing raised by the defense. I believe the Court did a good job of admonishing her, or, asking her if she could be fair and impartial and going through those customary things that the Court normally does with any potential juror. But, again, just given that she is on the jury and related to the Detective in this case, in a close relationship, that being his mother, I just wanted the record to be clear that the defense did not raise that or if the Court wanted to inquire of Mr. Creighton in his, you know, well, I guess anything related to that just so the record is clear.

THE COURT: I didn't feel moved to do that. I mean, again, I'm not going to second guess strategic reasons and I don't expect the defense to necessarily say that. Is there anything you want to put on the record in that regard, Mr. Creighton? I mean, the record is clear who she is. You had your opportunity for peremptories. If you don't want to put anything on the record, fine. The State has brought that up. Is there anything you want to say?

MR. CREIGHTON [defense counsel]: I would just acknowledge what the State says and that's all. Thank you.

THE COURT: Okay. Anything else?

MR. CARP: No.

MR. CREIGHTON: No.

(Tr., 123-124).

{¶12} Following opening statements, the State of Ohio presented its case through the testimony of four witnesses and the introduction of over one hundred exhibits.

{¶13} The aforementioned investigator, Aaron Montgomery, a Lima Police Department officer assigned to the West Central Ohio Crime Task Force, was the prosecution's first witness at trial. Investigator Montgomery testified that in August of 2020, he and other task force officers were engaged in an investigation involving Glass. Montgomery was the lead investigator in that investigation. On August 11, 2020, Montgomery was conducting surveillance of a house located at 2241 Lakewood Avenue in Lima, after law enforcement had received a number of complaints and other information concerning the residence at that address. Based

upon prior information obtained in the investigation, the officers believed that Glass and one Cynthia Fox resided at 2241 Lakewood at that time.

{¶14} Investigator Montgomery identified photographs taken by investigators while doing surveillance on August 11, 2020, which showed Fox in a bathrobe coming out of the house. Photos taken at that time also showed a red convertible parked in the driveway at 2241 Lakewood, a vehicle that Montgomery testified was tied to Glass and Fox. The photos also showed a black vehicle that pulled up and parked in the street just as Fox walked out of the house, according to Montgomery's testimony. As investigators watched, Fox got into the passenger side of the vehicle, an exchange appeared to take place, and then Fox got out of the black car and walked back toward the house as the black car drove away. Investigator Montgomery testified that such activity was consistent with drug trafficking. For that reason, he called for a uniformed officer from the Allen County Sheriff's Office to stop the black car, and illegal narcotics were discovered in that vehicle after the stop.

{¶15} Investigator Montgomery identified additional photographs taken by investigators on August 11, 2020. One of those showed Glass standing in the driveway at 2241 Lakewood while talking to Fox. Other photographs depicted Glass and Fox leaving the Lakewood Avenue residence in the red convertible, which occurred shortly after the traffic stop of the black car had been made. Another photograph showed a male in the driveway at 2241 Lakewood, believed by

Investigator Montgomery to be one Richard Brenneman. Montgomery testified that, in August of 2020, Brenneman was living in his truck that was parked outside of 2241 Lakewood.

{¶16} Finally, Investigator Montgomery testified that, once the red convertible driven by Glass with Fox in the passenger seat left 2241 Lakewood Avenue that day, other investigators conducted mobile surveillance of that vehicle as it drove through Lima, until a marked patrol unit from the Allen County Sheriff's Office pulled the convertible over for a traffic violation. At that point in the trial, the prosecution indicated that they had no more questions for Investigator Montgomery, but moved to reserve the right to recall Montgomery to the stand later in the trial, which was granted by the trial court.

{¶17} The State's second witness was Deputy Robert Wintersteller of the Allen County Sheriff's Office. Wintersteller testified that on August 11, 2020, he conducted a traffic stop of a red vehicle being driven down Lakewood Avenue, after being asked to do so by members of the West Central Ohio Crime Task Force. After making the stop, Wintersteller identified the driver of the red vehicle as Robert Glass and the passenger as Cynthia Fox. Wintersteller had Glass and Fox exit their vehicle and placed them in the back of Wintersteller's patrol cruiser so that a search could be conducted of the car that had been stopped. Prior to placing Glass in the cruiser, he was patted down and Wintersteller found cash in Glass's pockets.

{¶18} Wintersteller then stood by while the job of searching the red car was handled by task force officers who arrived at the location of the stop. Wintersteller testified that the cruisers used by the sheriff's office are equipped with audio and video recording devices. Wintersteller identified State's Exhibit 13 as a DVD containing an audio-video recording of the traffic stop, and State's Exhibit 13 was played for the jury. In that recording, while Glass and Fox are seated in the back of the cruiser, Glass tells Fox to "[g]ive it to me, you're going to be arrested."

{¶19} Deputy Wintersteller testified that, as the task force officers were searching the red vehicle, he was sitting in the driver's seat of his cruiser, running information on Glass and Fox. While doing do, Wintersteller noticed some movement in the rear of his cruiser. Wintersteller had Glass step out of the cruiser and, on the floorboard of the cruiser in the location where Glass had been seated, Wintersteller found a clear plastic bag of suspected methamphetamine. Deputy Wintersteller testified that the bag was located where Glass's feet had been while seated in the cruiser.

{¶20} Investigator Montgomery was then recalled to the stand at trial. Montgomery testified that the suspected methamphetamine found by Deputy Wintersteller in his cruiser was collected by the task force, and subsequently submitted to the Bureau of Criminal Investigation ("BCI") for analysis.

{¶21} In terms of the investigation on August 12, 2020, Investigator Montgomery testified that, following the traffic stop and search of the car driven by

Wintersteller, other task force investigators continued surveillance of the house at 2241 Lakewood Avenue while Montgomery prepared a search warrant for that location. Once the search warrant was signed by a judge, the warrant was executed at 2241 Lakewood by the Allen County Sheriff's Office S.W.A.T. team. Once the S.W.A.T. team made the initial entry, Montgomery and other task force officers entered the residence to begin the process of searching the home.

{¶22} Investigator Montgomery identified a diagram of the house at 2241 Lakewood Avenue, and explained where the various rooms inside the home were located. Among other things, Montgomery testified that one bedroom, located in the southwest corner of the house, was directly across a small hallway from a second bedroom, located in the northwest corner of the house.

{¶23} Investigator Montgomery testified that several persons were found inside the house when the S.W.A.T. team made entry. A female named Shannon Jackson, who Montgomery believed to be Glass's sister, was located in the kitchen. In the southwest bedroom, the S.W.A.T. entry team found a male named Brandon Johns, who was known to reside at 517 South Main Street at that time, and one Tiffany Warner, the girlfriend of Brandon Johns. Warner's three children were also located in the house. When the search warrant was served, Glass was not present in the home, nor was Cynthia Fox, as both of them had been taken into custody earlier that evening as a result of the traffic stop.

{¶24} In searching the southwest bedroom, investigators found drug paraphernalia and suspected methamphetamine residue on top of a table. Montgomery testified that a black book bag was found on the floor in front of a small refrigerator and, inside the book bag, investigators located a small pink container, as well as two prepaid bank cards bearing the names of two women who were unknown to the investigators. Investigator Montgomery testified that it was common for the task force to find debit cards and credit cards, often times stolen, in the possession of persons involved in the drug trade. Inside the pink container, investigators found two bags of suspected methamphetamine, which were also subsequently sent to BCI for testing, where it was determined that the methamphetamine found in the book bag weighed approximately 7.51 grams. Montgomery testified that the methamphetamine found in the book bag was the largest quantity found in the search of the bedroom.

{¶25} Investigator Montgomery testified that the closet in that southwest bedroom was filled with men's closing. On top of a table in that room was a small container in which two gun magazines were found, along with more drug paraphernalia. Investigators located additional quantities of methamphetamine in several places throughout the southwest bedroom. No methamphetamine was located anywhere else in the house. In the southwest bedroom, investigators also found a wallet with Glass's Ohio photo identification card in it. On top of the refrigerator in that room was a small safe, inside of which was a Hi-Point .380

caliber firearm and additional drug paraphernalia. Investigator Montgomery later test-fired the firearm and found it to be operational. Investigator Montgomery also testified that no items were found in the southwest bedroom bearing the names of anyone located in the home at the time the search warrant was served.

{¶26} Montgomery testified that in the northwest bedroom, investigators found the closet to contain female clothing. Documents relating to both Cynthia Fox and to Glass's sister, Shannon Jackson, were also located in the northwest bedroom.

{¶27} In the basement, investigators found pieces of mail dated July of 2020 and addressed to Glass, but that mail bore a Cridersville address. In the basement, a photograph of Glass and Fox, marked "2 ether [*sic*] forever" was also found. A second firearm, not a Hi-Point, was also located in the basement.

{¶28} On August 12, 2020, the day following the execution of the search warrant, Investigator Montgomery interviewed Glass at the Allen County Sheriff's Office. That interview was recorded, and the recording was played for the jury at trial. In that interview, Glass gave his address as 2241 Lakewood Avenue, and acknowledged he had been staying there for the past month. At one point in the interview, Montgomery asked Glass about the firearm found in the bedroom, without telling Glass the brand of gun that had been found. In response to that, Glass said "Hi-Point."

**{¶29}** Investigator Montgomery then testified further about the various amounts of methamphetamine that had been found in the southwest bedroom. Montgomery corrected his prior testimony that the largest quantity of methamphetamine had been found in the book bag, stating that he realized that the largest amount of methamphetamine had actually been found in a jewelry box in that room.

**{¶30}** Finally, Investigator Montgomery testified that the parties were stipulating in the case that Glass had a prior conviction for a felony offense of violence.

**{¶31}** The State's final two witnesses were Emily Miller and Kelsey Degen, forensic scientists employed by BCI and experts in the area of controlled substance analysis. Miller and Degen testified with regard to the weighing and analysis each of them had performed of the crystalline substances submitted to BCI in the case, and confirmed that their analyses had established that those substances contained methamphetamine.

**{¶32}** After the State of Ohio rested its case, the defense opted to present no witnesses. The defense did admit one photograph taken during the law enforcement surveillance of 2241 Lakewood Avenue on August 11, 2020.

**{¶33}** As noted above, following the closing arguments of counsel and jury instructions being given by the trial court, the jury deliberated for slightly less than four hours before returning guilty verdicts on all counts and specifications. After

the verdicts were accepted by the trial court, Glass was then sentenced as detailed above.

**{¶34}** In this appeal of the trial court's judgment of conviction and sentence, Glass raises two assignments of error for our review.

### First Assignment of Error

**Robert Glass was denied his right to a fair and impartial jury when the mother of the state's primary law-enforcement witness was seated as a juror in his case.**

### Second Assignment of Error

**Robert Glass was denied his right to effective assistance of counsel when his trial counsel failed to move to exclude the mother of the state's primary law-enforcement witness from the jury for cause or to excuse her from the jury using a peremptory challenge.**

**{¶35}** On appeal, the two assignments of error raised by Glass both relate to the fact that Investigator Montgomery's mother was seated as a juror in the trial of this case. Due to the nature of the specific claims raised in the assignments of error, we elect to address them out of order.

### Second Assignment of Error

**{¶36}** In the second assignment of error, Glass raises a claim of ineffective assistance of counsel. Specifically, Glass contends that his trial counsel was ineffective in failing to follow up on the trial court's questions to Mrs. Montgomery during voir dire, and in failing to challenge Mrs. Montgomery for cause and/or in failing to use a peremptory challenge to remove her as a juror.

**{¶37}** Upon review, this Court finds the first contention to be well taken.

*Standard of Review*

{¶38} To prevail on an ineffective assistance of counsel claim, a defendant must establish that (1) his trial counsel's performance was deficient and (2) such deficiency prejudiced the defense to the point of depriving the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984). Trial counsel's performance will not be deemed deficient unless it "fell below an objective standard of reasonableness." *Id*., at 688. To show prejudice, the case law often cites *Strickland* for the proposition that the defendant must prove there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. However, to be more precise, the prejudice inquiry focuses not only on outcome determination, but also on whether "'counsel's errors were so serious as to deprive the defendant of a fair trial, *a trial whose result is reliable*.'" (Emphasis added.) *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993), quoting *Strickland*, *supra*, at 687. "Thus, an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Id*.

{¶39} When reviewing an ineffective assistance of counsel claim, counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic trial decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991).

Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141 (1989).

**{¶40}** Regarding the specific claim at issue here, "[i]n general, 'it is for [trial] counsel to determine what questions should be asked on voir dire.'" *State v. Martin*, 2017-Ohio-7556, ¶ 50, quoting *State v. Group*, 2002-Ohio-7247, ¶ 139. For this reason, the Supreme Court of Ohio has "consistently declined to 'second-guess trial strategy decisions' or impose 'hindsight views about how current counsel might have voir dired the jury differently.'" *State v. Mundt*, 2007-Ohio-4836, ¶ 63, quoting *State v. Mason*, 82 Ohio St.3d 144, 157 (1998). However, while counsel has broad discretion in determining a juror's ability to be impartial, "'the decision whether to seat a biased juror cannot be a discretionary or strategic decision[.]'" *State v. Froman*, 2020-Ohio-4523, ¶ 49, quoting *Miller v. Webb*, 385 F.3d 666, 675 (6th Cir. 2004).

*Analysis*

**{¶41}** "The right to a trial by an impartial jury lies at the very heart of due process." *Smith v. Phillips*, 455 U.S. 209, 224-225 (1982), citing *Irvin v. Dowd*, 366 U.S. 717, 721-722 (1961). Pursuant to the Sixth and Fourteenth Amendments, the United States Constitution guarantees that a criminal defendant has a right to an impartial, unbiased jury. *State v. Froman*, *supra*, at ¶ 49. Similarly, "Section 5, Article I of the Ohio Constitution guarantees the right to a trial by jury, and this right 'carries with it by necessary implication the right to trial by a jury composed of

unbiased and unprejudiced jurors.'" *State v. Hessler*, 90 Ohio St.3d 108, 133 (2000), quoting *Lingafelter v. Moore*, 95 Ohio St. 384 (1917), paragraph one of the syllabus.

**{¶42}** Voir dire is the primary process that "serves the purposes of allowing the court and the parties to identify and remove jurors to ensure an impartial jury. *Froman*, *supra*, at ¶ 49. As previously noted, while counsel – and also the trial court – have broad discretion in determining a juror's ability to be impartial, "'the decision whether to seat a biased juror cannot be a discretionary or strategic decision[.]'" *Id.*, quoting *Miller v. Webb*, 385 F.3d 666, 675 (6th Cir. 2004). "Thus, when a juror who has exhibited actual bias against a defendant is seated on the jury, the defendant's Sixth Amendment right to an impartial jury has been violated." *Id.* Put another way, the seating of a biased juror who should have been dismissed for cause requires reversal of the conviction. *United States v. Martinez-Salazar,* 528 U.S. 304, 316 (2000).

**{¶43}** R.C. 2313.17 sets forth a list of circumstances determined by the Ohio General Assembly to constitute grounds under which a party may challenge a prospective juror for cause. In relevant part, R.C. 2313.17 provides:

> (B) The following are good causes for challenge to any person called as a juror:
>
> (1) That the person has been convicted of a crime that by law renders the person disqualified to serve on a jury;
>
> (2) That the person has an interest in the cause;

(3) That the person has an action pending between the person and either party;

(4) That the person formerly was a juror in the same cause;

(5) That the person is the employer, the employee, or the spouse, parent, son, or daughter of the employer or employee, counselor, agent, steward, or attorney of either party;

(6) That the person is subpoenaed in good faith as a witness in the cause;

(7) That the person is akin by consanguinity or affinity within the fourth degree to either party or to the attorney of either party;

(8) That the person or the person's spouse, parent, son, or daughter is a party to another action then pending in any court in which an attorney in the cause then on trial is an attorney, either for or against any such party to another such action;

(9) That the person discloses by the person's answers that the person cannot be a fair and impartial juror or will not follow the law as given to the person by the court.

* * *

(D) In addition to the causes listed in division (B) of this section, any petit juror may be challenged on suspicion of prejudice against or partiality for either party, or for want of a competent knowledge of the English language, or other cause that may render the juror at the time an unsuitable juror. The validity of the challenge shall be determined by the court and be sustained if the court has any doubt as to the juror's being entirely unbiased.

{¶44} In addition to the bases set forth in R.C. 2313.17 upon which a juror may be challenged for cause in Ohio, R.C. 2945.25 provides an additional list of circumstances that constitute grounds in a criminal case upon which a challenge for cause may be based. R.C. 2945.25 provides:

A person called as a juror in a criminal case may be challenged for the following causes:

(A) That the person was a member of the grand jury that found the indictment in the case;

(B) That the person is possessed of a state of mind evincing enmity or bias toward the defendant or the state; but no person summoned as a juror shall be disqualified by reason of a previously formed or expressed opinion with reference to the guilt or innocence of the accused, if the court is satisfied, from examination of the juror or from other evidence, that the juror will render an impartial verdict according to the law and the evidence submitted to the jury at the trial;

(C) In the trial of a capital offense, that the person unequivocally states that under no circumstances will the person follow the instructions of a trial judge and consider fairly the imposition of a sentence of death in a particular case. A prospective juror's conscientious or religious opposition to the death penalty in and of itself is not grounds for a challenge for cause. All parties shall be given wide latitude in voir dire questioning in this regard.

(D) That the person is related by consanguinity or affinity within the fifth degree to the person alleged to be injured or attempted to be injured by the offense charged, or to the person on whose complaint the prosecution was instituted, or to the defendant;

(E) That the person served on a petit jury drawn in the same cause against the same defendant, and that jury was discharged after hearing the evidence or rendering a verdict on the evidence that was set aside;

(F) That the person served as a juror in a civil case brought against the defendant for the same act;

(G) That the person has been subpoenaed in good faith as a witness in the case;

(H) That the person has chronic alcoholism, or a drug dependency;

(I) That the person has been convicted of a crime that by law disqualifies the person from serving on a jury;

(J) That the person has an action pending between the person and the state or the defendant;

(K) That the person or the person's spouse is a party to another action then pending in any court in which an attorney in the cause then on trial is an attorney, either for or against the person;

(L) That the person is the person alleged to be injured or attempted to be injured by the offense charged, or is the person on whose complaint the prosecution was instituted, or the defendant;

(M) That the person is the employer or employee, or the spouse, parent, son, or daughter of the employer or employee, or the counselor, agent, or attorney of any person included in division (L) of this section;

(N) That English is not the person's native language, and the person's knowledge of English is insufficient to permit the person to understand the facts and law in the case;

(O) That the person otherwise is unsuitable for any other cause to serve as a juror.

The validity of each challenge listed in this section shall be determined by the court.

*See also* Crim.R. 24(C).

{¶45} Thus, the Ohio statutes governing bases upon which to challenge prospective jurors for cause set forth a number of very specific circumstances that seemingly did not apply to Mrs. Montgomery in this case. However, both statutes, and also Crim.R. 24(C), contain more general provisions where a prospective juror may be removed for cause due to their voir dire answers demonstrating an inability to be fair and impartial, because a prospective juror is suspected of prejudice against or partiality for either party, because the person's state of mind evinces enmity or

bias toward the defendant or the state, or because the person is otherwise unsuitable for any other cause to serve as a juror. *See* R.C. 2313.17(B)(9); R.C. 2313.17(D); R.C. 2945.25(B); R.C. 2945.25(O); Crim.R. 24(C)(9); Crim.R. 24(C)(14).

{¶46} In order to determine whether a juror should be removed for cause, Crim.R. 24(B) provides that "[a]ny person called as a prospective juror for the trial of any cause shall be examined under oath or upon affirmation as to the prospective juror's qualifications." More importantly, "'[w]ithout an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.'" *State v. Bates*, 2020-Ohio-634, ¶ 30, quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). "The adequacy of voir dire thus directly affects the ability of the trial judge to be a diligent gatekeeper to protect the defendant's constitutional rights." *Bates*, at ¶ 31.

{¶47} During the voir dire in the instant case, a prospective juror's son was the prosecution's key law enforcement representative seated at counsel table and therefore would have presumably remained in the courtroom throughout the trial. It would have also been clear from the discovery that the prospective juror's son was the lead investigator on the case at issue and therefore presumably the state's main witness at trial. Under such circumstances, we find that both the law and common sense dictate that Mrs. Montgomery should have been questioned thoroughly by

defense counsel during voir dire to explore and potentially expose any inherent bias that she may have possessed, be that bias conscious or otherwise.

{¶48} While the trial court briefly examined Mrs. Montgomery as to those issues, it is clear from the record that the trial court's questioning was not intended to be a thorough voir dire on such matters and that the trial court, reasonably so, anticipated that counsel would pursue the questioning called for under the circumstances. Because Glass's trial counsel failed to follow up in any way with questioning Mrs. Montgomery about her ability to be a fair and impartial juror in a trial involving her son's participation to the extent noted, and because the State asked no such questions during voir dire upon which defense counsel could have relied in assessing any potential actual bias on Mrs. Montgomery's part, we find that defense counsel's failure to conduct such an inquiry was objectively unreasonable pursuant to *Strickland*.

{¶49} Based solely on the trial court's brief and preliminary voir dire of Mrs. Montgomery, the limited record before us reflects no actual bias on her part. However, we note that there is a well-established line of case law, particularly in the federal courts, holding that "[t]he bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as matter of law." *United States. v. Wood*, 299 U.S. 123, 133 (1936). Such a presumption of bias may be justified where a juror is "a close relative of one of the participants in the trial or the criminal transaction." *See Smith v. Phillips*, 455 U.S. 209, 222 (1982)

(O'Connor, J., concurring). "Most cases finding implied bias 'have done so because the juror had a close relationship with one of the important actors in the case or was otherwise emotionally involved in the case, usually because the juror was the victim of a similar crime.'" *United States v. Abreu*, No. 21-60861, 2023 WL 234766 (5th Cir. Jan. 18, 2023), quoting *Solis v. Cockrell*, 342 F.3d 392, 398-399 (2003).

**{¶50}** The Supreme Court of Ohio has not directly addressed the issue of implied bias in any case where circumstances dictated that it could be necessary to presume bias on a juror's part, and therefore no precise legal test currently exists in this state prescribing under what extreme circumstances, if any, juror bias might be presumed as a matter of law. However, when analyzing a claim of juror bias in *State v. Beasley*, 2018-Ohio-493, the Supreme Court of Ohio stated that "[a] juror is permitted to serve so long as her relationship to a person in the case is distant and casual, rather than close and ongoing." *Id.*, at ¶ 128. In *Beasley*, the Ohio Supreme Court then clearly suggested that a particularly close or intimate relationship between a juror and a trial participant may give rise to a presumption of bias. *Id. Accord State v. Hale*, 2008-Ohio-3426, ¶ 208.

**{¶51}** We note, without specifically holding, that a parent/child relationship between a juror and a key witness for the prosecution could very well be the type of "close and ongoing" relationship that might give rise to a presumption of bias and, on appropriate facts, support a finding of implied bias pursuant to the law cited above. However, we do not reach that issue in this case because the record before

us contains no information as to whether Investigator Montgomery and his mother shared a "close and ongoing" relationship or not. As with the lack of information in the record as to whether Mrs. Montgomery possessed an actual bias that would have required her being removed for cause, the lack of information as to whether the juror and her son shared a particularly close relationship, biology aside, is also directly attributable to defense counsel's failure to explore that issue with Mrs. Montgomery during voir dire. Because we can discern no valid reason as to why Glass's trial counsel did not question the juror regarding issues relevant to implied or presumed bias, we again find that counsel's failure to conduct such questioning was objectively unreasonable under *Strickland*.

**{¶52}** Thus, despite the wide latitude typically afforded defense counsel in determining how to best conduct voir dire in criminal cases, we nonetheless find, on the specific facts of this case, that trial counsel performed deficiently under *Strickland* in two related but separate ways: the failure to explore whether actual bias existed that might have supported removal for cause and the failure to probe issues relevant to presumed bias. That deficient performance by defense counsel during voir dire with regard to the juror at issue constituted a lapse of the duty owed his client to use reasonable efforts to ensure a fair and impartial jury, and therefore falls well outside "the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, deemed acceptable in that seminal case.

{¶53} Finally, applying the standards delineated above that are relevant to the second prong of the *Strickland* test for reviewing the effectiveness of counsel, we find that trial counsel's deficiencies in this case prejudiced the defense to the point of depriving Glass of a fair trial. Counsel asked no pertinent questions of a juror whose relationship with the State's key witness involved a very strong potential for actual or implied bias on the part of the juror, and therefore counsel permitted a juror to be seated under circumstances that called the fairness and impartiality of that juror into very real question. Additionally, we find the integrity of the verdict to be questionable because the presence of the lead investigator's mother on the panel deciding the case could have readily had an extremely chilling and prejudicial effect on the deliberations of the jury as a whole. For those reasons, we hold that counsel's errors were so serious that they deprived Glass of a trial whose result was reliable and, accordingly, Glass has established reversible prejudice.

{¶54} As this Court finds that the ineffective assistance of counsel claim raised regarding counsel's failure to voir dire the juror requires reversal of Glass's conviction and sentence, we do not reach the other aspects of the additional ineffective counsel claims raised by Glass.

{¶55} The second assignment of error is sustained.

*First Assignment of Error*

**{¶56}** In the first assignment of error, Glass argues that his right to a fair and impartial jury was violated and that the trial court committed plain error and structural error by permitting Investigator Montgomery's mother to be seated on the jury. However, our resolution of the second assignment of error renders the first assignment of error moot and we decline to address it. See App.R. 12(A)(1)(c).

*Conclusion*

**{¶57}** Having found error prejudicial to the defendant-appellant, the judgment of the Allen County Court of Common Pleas is reversed and the case is remanded to the trial court for further proceedings.

***Judgment reversed***
***and cause remanded***

**ZIMMERMAN, J., concurs.**

**MILLER, J., concurs in judgment only.**